**In re ALEXANDER C.**

[Cite as *In re Alexander C.*, 164 Ohio App.3d 540, 2005-Ohio-6134.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–05–1173.

Decided Nov. 18, 2005.

542

Asad S. Farah, for appellants.

David T. Rudebock, for appellee.

Skow, Judge.

{¶ 1} On November 15, 2004, Alexander, Arlene, and Walter,[1] all minor children of the appellants, their mother and father, were taken into emergency

---

1. Another child, Brandon, born October 21, 2004, died on December 3, 2004, after being discharged from the hospital the previous day into the care of the relative charged with temporary custody placement of all the children.

shelter care upon the filing of a complaint alleging in dependency and neglect by the Lucas County Children Services ("LCCS") agency. The complaint alleged severe domestic violence between the parents and stated that the mother was afraid to leave the father. The Lucas County Court of Common Pleas, Juvenile Division, appointed a guardian ad litem ("GAL") for the children and separate counsel for the mother and the father. On December 10, 2004, the father filed a motion to release the children from shelter care. At a hearing ten days later, the court found that probable cause still existed to continue the children's placement in shelter care.

{¶ 2} Beginning January 25, 2005, hearings before a juvenile court magistrate commenced on the issue of adjudication, and proceedings continued until concluded on May 5, 2005, when the trial court approved the magistrate's decision and adopted it as the order of the court. At adjudication, the magistrate found the children dependent and neglected. Upon disposition, legal custody of all three children was given to a relative of the father living in Seneca County, but appellants' parental rights to their children were not terminated. The father filed objections to the magistrate's order and findings of fact and conclusions of law. The trial court affirmed.

{¶ 3} From that judgment transferring legal custody of the children, the father and the mother raise the following assignments of error:

{¶ 4} "I. That the juvenile court erred in that the evidence lacked the clear and convincing standard that the children are neglected and dependent children pursuant to O.R.C. 2151.03 and 2151.04 [sic]."

{¶ 5} "II. That the juvenile court erred in that the evidence lacked a showing that the agency made reasonable efforts to prevent the removal of the minor children from the home."

{¶ 6} We begin by noting again that appellants' parental rights to their children were not terminated. "Legal custody where parental rights are not terminated is not as drastic a remedy as permanent custody." *In re A.W.-G.* 12th Dist. No. CA2003-04-099, 2004-Ohio-2298, 2004 WL 1040696, at ¶ 7. A trial court is not required to make a finding of parental unfitness before granting to a nonparent custody of a child adjudicated dependent or neglected. *In re Trowbridge,* 10th Dist. Nos. 03AP-405 and 03AP-406, 2004-Ohio-2645, 2004 WL 1152934. Parents retain residual parental rights and have the opportunity to request the return of their children. Thus, the trial court's standard of review of the magistrate's disposition of legal custody is a preponderance of the evidence. *In re Nice* (2001), 141 Ohio App.3d 445, 751 N.E.2d 552. An appellate court reviews legal custody determinations for an abuse of discretion. *In re Guedel S.* (June 16, 2000), 6th Dist. No. L-99-1343, 2000 WL 770132, *2. We also note that

in custody cases, credibility issues are critical, because the demeanor and attitude of the witnesses may not translate into the record; thus, an appellate court affords deference to a judge or magistrate's findings regarding witnesses' credibility. *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 419, 674 N.E.2d 1159.

{¶ 7} However, because no change of legal custody to nonparents could have occurred without an adjudication of dependency or neglect, we first review the adjudications under appellants' first assignment of error. A trial court's adjudication of a child as abused, neglected, or dependent must be supported by clear and convincing evidence. R.C. 2151.35(A). Clear and convincing evidence is that which produces "in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 18 OBR 419, 481 N.E.2d 613, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118. When an appellate court reviews a trial court's adjudication to determine whether the judgment is supported by clear and convincing evidence, the reviewing court must "determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *In re Christian,* 4th Dist No. 04CA10, 2004-Ohio-3146, 2004 WL 1367399, at ¶ 7, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54. That is, we examine the record to determine whether appellee sustained its burden of producing clear and convincing evidence of dependency and/or neglect as defined by R.C. 2151.03 and 2151.04. Appellate courts should not reverse a trial court's adjudication when competent and credible evidence supports the findings of fact and conclusions of law. Id.

{¶ 8} Appellants first contest the magistrate's finding that the children were neglected and dependent and the trial court's adoption of that finding. An adjudication of dependency or neglect as the basis for a change in custody is a separate appealable issue. *In re Murray* (1990), 52 Ohio St.3d 155, 161, 556 N.E.2d 1169. The trial court must determine whether the children were neglected or dependent as of the date or dates alleged in the complaint, not whether the children were neglected or dependent as of the date of the adjudicatory hearing. R.C. 2151.23(A)(1), legislatively overruling *In re Kronjaeger* (1957), 166 Ohio St. 172, 1 O.O.2d 459, 140 N.E.2d 773; see, also, *In re Sims* (1983), 13 Ohio App.3d 37, 13 OBR 40, 468 N.E.2d 111; *In re Rowland* (Feb. 9, 2001), 2d Dist. No. 18429, 2001 WL 109182.

{¶ 9} The complaint filed on November 15, 2004, alleged that severe domestic violence was occurring between the parents and that the father had threatened an LCCS caseworker. The complaint referenced a pre-existing case involving all three children, noting that the prior case "sunsets" on the date the new complaint was filed. Apparently, an adjudicatory hearing could not be held before the time period required, and this situation necessitated the filing of a new complaint.

Although no records from the prior case were made part of this record, caseworker notes indicated that the children's placement with the agency began on May 20, 2004, when the agency began protective supervision of the children while they were living with their mother.[2] On November 12, 2004, a magistrate issued another ex parte order for emergency shelter care, based upon alleged severe domestic violence between the parents.

{¶ 10} The November 15, 2004 complaint alleged that Alexander, Arlene, Walter, and Brandon were dependent and neglected and asked that legal custody be granted to a relative of the father. Included in the complaint forming the basis of dependency and neglect were the following allegations: that the father abused the mother physically, verbally, and emotionally; that the mother had revealed to caseworkers that the father had physically abused her while she was pregnant with Brandon; that the mother had been evicted from her previous apartment for nonpayment of rent; that the father takes money from other adult family members residing with the father and mother; that at an emergency hearing on the previous complaint, a no-contact order between the father and the mother was put in place; that immediately after that emergency hearing, on August 13, 2004, the mother and the children were taken to a battered women's shelter; and that after spending one day at the shelter, the mother had left with the children to go to her mother's home and had continued to have contact with the father.

{¶ 11} At the December 20, 2004 hearing upon the father's motion to terminate temporary custody, the father testified that at the time the children were removed, he lived with the children in a home owned by his sister, and the mother lived a few houses down the same street in a home that his sister also owned. The father's mother and two sisters also reside in the home. The father testified that he cared for the children and his mother during the day and provided for them with a pension received from over 27 years of employment with a railroad. He stated that the children were in perfect health, had never missed a doctor's appointment, had never missed school, and had their medical requirements up to date, and that Alexander attended Head Start regularly. He stated that he cooks and keeps plenty of food and a clean home.

{¶ 12} As to his relationship with the mother, he stated that they have no problems and regularly attend church together. On cross-examination, when asked whether he had received any type of counseling to address issues concern-

---

2. Slightly complicating the adjudicatory proceedings was the fact that the mother and father have resided separately during LCCS's investigations, but the homes were close to each other and the children appeared to spend ample amounts of time with both parents. At no point does the record reflect any dispute between the parents concerning their living and parenting arrangements.

ing his relationship with the mother, the father stated that there were no relationship issues and that no counseling was needed. He also admitted that he had not yet visited with the children, though the reasons are unclear. The record reflects a visitation order permitting the mother to visit once a week while the children are in temporary custody, but the father was not listed as having visitation privileges.

{¶ 13} The GAL appointed for the children asked the father whether he was current on his rent on the house, and the father asserted that he was. She then asked whether he was aware that an eviction notice to vacate the property had been served. The father disputed this, asserting that the rent was current. The GAL then stopped her questioning, and no eviction notice was presented as evidence.

{¶ 14} An LCCS caseworker then testified, stating that the ongoing caseworker was on medical leave and that she had substituted for that caseworker since the end of November 2004. She stated that she had seen the children only once with Mrs. C., the father's niece and the relative with whom the children were placed. She also saw them on December 3, 2004, at another relative's home. The Cs live in Seneca County, and the caseworker testified that the Seneca County Children Services agency was "supervising" the case for LCCS. The only information she had regarding the children was that Alexander had experienced some nightmares since the death of his brother Brandon on the evening of December 3, 2004. She stated that she had been to the mother's home (owned by the father's sister) but did not know from which home the children were removed and did not testify as to the condition of the home or the previously referenced eviction notice.

{¶ 15} The magistrate asked the GAL for a recommendation, and the GAL indicated that her investigation was not complete but that she recommended that the relative placement continue. The magistrate agreed, "given the testimony [that had] already been placed on the record by the Agency at the shelter care hearing." [3] He found that probable cause still existed and ordered the temporary custody to continue.

{¶ 16} The parents were represented by separate appointed counsel at the adjudication held on January 25, 2004. LCCS commenced its case by presenting the testimony of its investigative caseworker, John McCormick. He stated that he had come into contact with the children when LCCS received a referral on May 20, 2004, concerning physical abuse of Walter, the youngest. Upon his investigation, McCormick concluded that no abuse had occurred. When asked

---

3. A transcript of the shelter-care hearing was not made a part of the record; however, it is irrelevant to our determination of this appeal because appellants have not raised the issue.

about subsequent referrals, he stated, "I had many contact [sic] with other agencies, MRDD, Adult Protection Services, Jobs and Family Services, Early Intervention, concerns about the family." He also stated that the contacts with other agencies concerned domestic violence, but he did not elaborate.

{¶ 17} Regarding his investigations of the domestic violence, he stated that the mother had refused to meet with him; he then "tracked" her to an appointment to determine her benefits with Job and Family Services. McCormick stated that at that time, which was approximately July 26, 2004, the mother disclosed that the father was physically violent with her several days a week, that she was sometimes afraid to go home, and that the father took about 95 percent of the mother's brother's disability income from him.[4] However, McCormick stated that the mother did not indicate whether the children were ever present during the acts of domestic violence, and he could not recall whether he had questioned the mother regarding any effect the father's violence toward the mother may have had on the children.

{¶ 18} On July 28, McCormick took Jeanine Park, a domestic-violence advocate, to meet the mother at her job at Meijer's. McCormick stated that the mother disclosed substantially the same information to both him and Park at that time. He also stated that the mother disclosed the same acts of domestic violence at a staffing held on August 18, 2004, and that the mother disclosed parenting stress and admitted that due to stress, she had tried to choke one of the children to make the child stop crying. Later, McCormick added that the mother admitted that she had attended work with bruises resulting from the father's physical abuse.

{¶ 19} McCormick stated that he did not attempt to ask the father about the domestic violence allegations and stated that he had made no attempt to refer the father or the children to any services; he referred only the mother to counseling services with Jeanine Park. When asked about the father, McCormick stated that the father had reacted to him in conversations by being "very loud, very verbal, [and] threatening" and that the father had ordered him out of his house, claiming that he did not have to talk to anyone.

{¶ 20} On cross-examination, McCormick admitted that the mother had not invited him to the July 26 meeting at Job and Family Services, that he was there with the permission of the caseworker, and that he knew the mother would lose her welfare benefits if she did not attend that particular meeting. He met the mother there because she had been avoiding his phone calls and had not responded to his mailings. The mother had responded on May 20 by leaving a

---

4. The mother disclosed at that time that her brother lived with their mother at the time and is disabled. McCormick stated that he referred the matter to Adult Protective Services.

message with McCormick in which she told him, "You don't have a case. Don't come back here. Don't bother me at work because my employer won't allow it."

{¶ 21} After McCormick's testimony, appellee presented Jeanine Park, the domestic-violence-prevention advocate, as a witness. After her testimony, the magistrate granted the father's motion in limine to exclude Park's testimony because appellee had not disclosed her as a witness until approximately five days before the adjudication.

{¶ 22} The court then received the testimony of Wanda Cannon, another LCCS caseworker, who had been involved with the family from the end of August 2004 to the beginning of November 2004. Cannon also testified that the mother had disclosed the father's acts of domestic violence towards her. Cannon accompanied the mother to the shelter after the magistrate in the prior case issued the no-contact order. Cannon further stated that the mother had admitted that the children were "in the home" during some of the father's acts of domestic violence towards her, but the mother did not say how much the children had seen or whether they were in the room when the violence took place. However, she did not testify regarding domestic violence or other abuse of the children and did not comment on the children's environment in any other respect.

{¶ 23} At the close of appellee's testimony, counsel for the father moved to dismiss the complaint based on a lack of evidence of abuse, dependency, or neglect, and the trial court immediately denied the motion. The father then presented a neighbor as a witness. The neighbor testified that he sometimes drove the mother to work and saw the oldest child when the father brought him over to visit. He said he never saw anything wrong with the child and that he was always well fed, well behaved, and decently dressed. The neighbor had visited the father's household and had seen the mother there; he said he never saw anything unusual or anything that gave him cause for concern regarding the children or the mother.

{¶ 24} When the mother testified, she flatly contradicted the testimony of the caseworkers, stating that she could not recall any incidents of abuse by the father and that the alleged incidents did not occur. She said that she was never afraid to go home, that the father takes her money only because she allows it, and that the father "knows about paying bills and stuff like that." She works full-time and leaves the children who are not in school either with the father or with her mother. She maintains health insurance for the children through her employment and stated that the insurance had never lapsed and that the children were always taken to all necessary doctor's appointments. Regarding her previous apartment, the mother stated that the father was going back and forth between the apartment and his mother's house and that she was evicted only because she refused to pay the rent until the landlord fixed certain problems. However, she

could not recall whether she had placed rent into escrow. She began testifying about Walter's physical needs and required therapists' appointments; however, her counsel stopped the line of questioning as irrelevant to the complaint because it did not allege a failure to provide medical care. Regarding her alleged violations of the prior no-contact order, she stated that upon leaving the shelter, she took the children to her mother's home, but she admitted that the father may have continued to help care for the children while she was at work.

{¶ 25} When requestioned about her prior revelations of abuse, she reiterated that no incidents of abuse occurred, and she theorized that the agency was attempting to separate her from the father because they are a biracial couple.

{¶ 26} The court then received the testimony of a member of the parents' church, who stated that she had seen the parents and the children many times; she described the children as clean, happy, healthy, and playful. She never had any concerns for the children and never noticed anything unusual about their behavior or about the way their parents treated them. She described the father and mother as normal and stated that she had never seen either threaten the other and had never seen the mother afraid of the father.

{¶ 27} The GAL testified that although she had spoken to the mother several times, the mother had never disclosed any incidents of domestic violence to her, but that the mother had admitted that the father still saw the children regularly during the no-contact order. When the GAL questioned the mother about the complaint's allegations, the mother stated that she was not afraid of the father; however, the GAL noted that she had interviewed the parents together at the mother's home. Regarding the father, the GAL testified that his attitude had been "confrontive." When asked to elaborate, she stated: "When I would ask questions, he would have answers. And then when I would try to get him to elaborate on the answers so that I would understand what he was talking about, then he would have different answers for things or would want to change the subject and talk about other things. * * * When I would pursue a line of questioning, he would get very agitated. He got very agitated and loud, and some people might find his demeanor threatening. He would lean over across the table at me. * * * I don't know if he was attempting to intimidate me or if that's just how he deals with people." The GAL's testimony then concluded.

{¶ 28} In closing statements, counsel for each parent renewed arguments that the evidence failed to show either dependency or neglect. Appellee argued that the mother's prior disclosures of domestic violence and the consequent exposure of the children to domestic violence were sufficient to demonstrate dependency and neglect. The trial court agreed and summarily adjudicated the children both dependent and neglected, stating: "Well, the agency did present evidence of dependency and neglect and, quite frankly, the explanations that the parents have

given make absolutely no sense. And you need to be told that. Some sort of conspiracy between MRDD and LCCS, that's what the father says. And then the mother says that this is some sort of a way for the Agency to get back at her because they're trying to separate her from a black man. What you're saying makes absolutely no sense and you need to hear that. It makes no sense. There's going to be an adjudication of dependency and neglect." The matter then immediately moved to disposition.

{¶ 29} An administrative review had occurred on December 10, 2004. Case information sheets for each child list the mother's address as the battered women's shelter—a discrepancy that was noted during adjudication.[5] Notes indicate that the goal for the family had been changed to "C"—meaning what, is unclear.[6] It also notes that the original case plan for the prior case was incorporated by reference; however, nothing from that case is included in the record of this case. Case planning indicates referrals to a domestic-violence-prevention program and parenting classes for the mother, notes that the father was ordered to have a diagnostic assessment and is awaiting referrals, and referrals for the father to a domestic-violence-offenders program. The mother is noted as having participated in the planning session, but she did not sign her agreement with the plan.

{¶ 30} Under a section labeled "Circumstances regarding removing child from home," the review notes a risk of domestic violence and states that the parents had violated a safety plan, but it does not refer to any facts or circumstances surrounding the alleged violations. Again, the safety plan, apparently instituted under the prior complaint, is not included in this record. Visitation is also noted, with the mother allowed supervised visitation once per week for at least one hour, although no visitation is listed for the father. The review also notes that "overnight visits can begin after the reunification has been approved at an LCCS staffing"—confirming that reunification was not a goal of the service providers then.

{¶ 31} The December 10, 2004 review also reports that the mother had attended two domestic-violence counseling sessions in two weeks and that she

---

5. Apparently, throughout this case, various caseworkers confused or cross-listed the parents' addresses and neglected to carefully note which address belonged to which parent. We need not determine their correct addresses. However, clearly the parents maintained at least one home, if not two, and also cared for their parents and at least one sibling at the addresses. Moreover, aside from the mother's prior eviction from an apartment, which pre-dates the dates on which the complaint alleges that the neglect and dependency occurred, the magistrate's findings of fact for adjudication are devoid of reference to their living arrangements or the conditions of their household(s).

6. Presumably, it represents an intention to seek to change the children's custody.

was required to complete eight out of ten total sessions. As for the mother's parenting class, the caseworker reported that the mother would not be referred to a parenting class until she had made significant progress in counseling in the domestic-violence program. The record does not reflect whether the referral to a parenting class was ever completed so that the mother could attend. The caseworker also noted that the father had not responded; testimony at adjudication also indicated that the father had not followed through and had not had an initial assessment for services.

{¶ 32} After the proceedings moved to disposition, testimony was received regarding an award of legal custody to the father's cousin in Seneca County, with whom the children had been living since at least November 2004. With respect to the mother's progress, the caseworker again noted the mother's involvement in domestic-violence counseling, admitted that parenting classes had not yet begun, and noted that the agency still felt that the mother minimized the domestic violence and was not "internalizing" the domestic-violence counseling. The agency felt that the children would be at risk with the parents.

{¶ 33} The father's niece testified about the conditions of her temporary custody of the children, asserted that she and her husband would be willing to accept legal custody until all of the children were 18 years old, and stated that she would be willing to supervise visitation between the children and their parents.

## Law and Analysis

{¶ 34} Appellants' first assignment of error asserts that the adjudications were unsupported by clear and convincing evidence. We agree.

{¶ 35} Appellee points to several bases supporting the adjudications of dependency and neglect: first, that at the time LCCS became involved, the parents were in a domestically violent relationship; second, that the parents had unintelligible theories as to why LCCS would try to take their children; third, that the father was uncooperative, "loud, belligerent, and dominating" and had threatened an LCCS caseworker who visited the home; and fourth, that the father controls all of the money, takes the mother's brother's money, and allows the mother very little for herself; and fifth, that the parents were evicted from a previous apartment and had not paid the rent for one of their homes.

{¶ 36} The magistrate's findings of fact for adjudication are more sparse: they reiterate the caseworkers' testimony regarding the mother's disclosures of domestic violence, find the parents' denials of domestic violence "preposterous" and not credible, find that domestic violence had occurred with the children present in the home, find that the father and mother had violated the no-contact order, and characterize the father's contact with agency caseworkers as "loud, belligerent,

and dominating." The findings of fact contain no reference to the father's alleged economic abuse and no reference to a prior eviction from an apartment.

{¶ 37} A "neglected child" has been statutorily defined by R.C. 2151.03, and clear and convincing evidence must support a magistrate's determination that a child falls within the statute's purview. "The 'clear and convincing evidence' standard is a higher degree of proof than the 'preponderance of the evidence' standard generally utilized in civil cases but is less stringent than the 'beyond a reasonable doubt' standard used in criminal cases." *In re Barnhart*, 4th Dist. No. 05CA8, 2005-Ohio-2692, 2005 WL 1283675, ¶ 17, citing *In re Baby Girl Doe* (2002), 149 Ohio App.3d 717, 778 N.E.2d 1053. In order for a court to adjudicate a child as neglected, the child must be one:

{¶ 38} "(1) Who is abandoned by the child's parents, guardian, or custodian;

{¶ 39} "(2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian;

{¶ 40} "(3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;

{¶ 41} "(4) Whose parents, guardian, or custodian neglects the child or refuses to provide the special care made necessary by the child's mental condition;

{¶ 42} "(5) Whose parents, legal guardian, or custodian have placed or attempted to place the child in violation of sections 5103.16 and 5103.17 of the Revised Code;

{¶ 43} "(6) Who, because of the omission of the child's parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare;

{¶ 44} "(7) Who is subjected to out-of-home care child neglect." R.C. 2151.03(A).

{¶ 45} For an adjudication of neglect, as statutorily defined, proof is required "that the parents were willfully at fault in abandoning or neglecting the children or refusing to perform their parental duties." *In re Bibb* (1980), 70 Ohio App.2d 117, 120, 24 O.O.3d 159, 435 N.E.2d 96. In contrast, "a finding of dependency under R.C. 2151.04 must be grounded on whether the children are receiving proper care and support." Id. R.C. 2151.04 defines dependency and states:

{¶ 46} " '[D]ependent child' means any child:

{¶ 47} "(A) Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian;

{¶ 48} "(B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;

{¶ 49} "(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." R.C. 2151.04(A), (B), (C).[7]

{¶ 50} Thus, the focus in a determination of dependency is on the condition of the children, not on the fault of the parents. *In re Bibb*, 70 Ohio App.2d at 120, 24 O.O.3d 159, 435 N.E.2d 96. "A definition of 'proper parental care'[8] is found in R.C. 2151.05, which states that a child is without proper parental care if the home is filthy and unsanitary or he does not have necessary support, medical attention and education or discipline. The fact of dependency must be proved by clear and convincing evidence." Id. See, also, *In re Bishop* (1987), 36 Ohio App.3d 123, 521 N.E.2d 838, paragraph one of the syllabus.

{¶ 51} Therefore, an adjudication of dependency must be based on the condition or environment of the child. *In re Bishop* (1987), 36 Ohio App.3d at 124, 521 N.E.2d 838; *In re Burchfield* (1988), 51 Ohio App.3d 148, 156, 555 N.E.2d 325. "That being said, a court may consider a parent's conduct insofar as it forms part of the child's environment. See *In re Burrell* (1979), 58 Ohio St.2d 37, 39 [12 O.O.3d 43, 388 N.E.2d 738]. The parent's conduct is significant if it is demonstrated to have an adverse impact on the child sufficient to warrant state intervention." *In re Ohm*, 4th Dist. No. 05CA1, 2005-Ohio-3500, 2005 WL 1595245, at ¶ 21.

{¶ 52} The magistrate's decision form was signed by him on January 25, 2005, but was file-stamped February 7, 2005; findings of fact for the adjudication and disposition were attached. Neither document references a statutory section upon which the magistrate relied for the adjudications. Both parties' arguments rest on conclusory assertions that domestic violence between the parents and the extent of their participation in case-planning services either are or are not sufficient to find dependency and neglect.

{¶ 53} We turn first to the adjudication of neglect. The complaint does not allege and the magistrate did not find any statutory condition relevant to an adjudication of neglect as defined by R.C. 2151.03. The magistrate's findings of fact regarding the incidents that caused the alleged neglect, at the dates alleged in the complaint, center upon the father's domestic violence against the mother.

---

7. Appellee does not dispute that section (D) does not apply here.

8. R.C. 2151.04 was amended in 1996 by 1996 H.B. No. 274, which changed "proper" to "adequate."

Only one caseworker out of four testified that the mother divulged that the children were in the home at the time of any incidents. Standing alone, this evidence cannot support a conclusion that the children were abandoned or lack adequate parental care, necessary subsistence, education, medical or surgical care, that the parents refused to provide special care, or that the children suffer physical or mental injury that harms or threatens to harm their health or welfare. R.C. 2151.03. We find no evidence of neglect that falls within the statute's purview, and thus we must find appellants' assignment of error well taken with respect to the determination of neglect.

{¶ 54} Usually, when domestic violence between the parents is an issue, more evidence supports a causal connection between the alleged incidents and their alleged effect on a child—i.e., telephone calls to police, police reports, the child's statements, etc. See *In re Tate* (Sept. 12, 2001), 9th Dist. No. 20417, 2001 WL 1044084, which reversed an adjudication of neglect, although the mother had failed to comply with the safety plan after the agency received allegations of domestic violence between the parents. In *Tate*, as here, the mother had steady employment and adequate financial resources, and there was no evidence that the children were not properly fed, clothed, and cared for.

{¶ 55} Lack of voluntary compliance with case planning has been held insufficient, in and of itself or without more evidence, to establish neglect of children. *In re Locker*, 5th Dist. No. 2002–AP02–0011, 2002-Ohio-6124, 2002 WL 31518192, at ¶ 27. The record in this case reflects that as of the date of the administrative review, the mother was complying with the case plan by participating in the services to which she had then been referred—the domestic-violence counseling—and that the mother could not start parenting classes until a referral to those classes was made upon her completion of the domestic-violence counseling.

{¶ 56} Since appellee presented no evidence that the parents' actions constituted or caused the children any neglect as defined by the statute, we find that no clear and convincing evidence supports the adjudication of neglect, and appellant's first assignment of error is well taken with respect to the neglect adjudication.

{¶ 57} As for the adjudication of dependence, a "finding of dependency under R.C. 2151.04 must be grounded on whether the children are receiving proper care and support. *In re Bibb* (1980), 70 Ohio App.2d 117, 24 O.O.3d 159, 435 N.E.2d 96. The focus is on the condition of the children, not the fault of the parents. Id." *In re Webb* (1989), 64 Ohio App.3d 280, 288, 581 N.E.2d 570.

{¶ 58} We have held that a long history of domestic violence between the parents can constitute the clear and convincing evidence necessary for a finding pursuant to R.C. 2151.04(C); that is, a child residing in a household where the

parents' relationship is marred by domestic violence is one whose condition or environment is such as to warrant the state, in the interests of the child, to assume the child's guardianship. *In re Jehosephat W.*, 6th Dist. No. L–01–1505, 2002-Ohio-5503, 2002 WL 31270290, at ¶ 17, citing R.C. 2151.04(C). In *Jehosephat*, the evidence included prior adjudications of dependency regarding siblings and substantiated claims of physical and sexual abuse, and one appellant had left the child at the police station after a domestic-violence incident. In the present case, however, only one caseworker out of four who spoke with the mother testified that the mother had disclosed that the children were in the home—a very general, single statement, with no testimony in elaboration. Records from the shelter that the mother attended were subpoenaed, as were any existing police reports; however, the record is devoid of any such evidence. The agency bears the burden of demonstrating that the children's conditions or environment is such as to fall within the statute's definition of dependency. One general statement by the mother (later recanted), reported by a caseworker, that children were in the home during an unknown number of episodes of domestic violence between the parents is clearly insufficient.

{¶ 59} We have also held that an adjudication of dependency is improper without evidence that the child or children suffered from any conditions listed in the statute and where it was "undisputed that their needs for shelter, food and other necessaries were satisfied." *In re Tikyra A.* (1995), 103 Ohio App.3d 452, 454, 659 N.E.2d 867. Since the focus in a dependency adjudication is upon the children's environment, even when there is testimony that a mother may have injured or allowed injury to occur to another child in her home, when there is no evidence regarding the conditions of the children at issue, the adjudication of dependency is against the weight of the evidence. See *In re A.C.*, 9th Dist. Nos. 03CA0053, 03CA0054, and 03CA0055, 2004-Ohio-3248, 2004 WL 1397624, stating that the agency was "required to present evidence of conditions or environmental elements that were adverse to the normal development of the children. * * * The conduct of the parent is relevant only insofar as it forms a part of the children's environment and it is significant only if it has a detrimental impact on them." Id. at ¶ 14, citing *In re Burrell* (1979), 58 Ohio St.2d 37, 39, 12 O.O.3d 43, 388 N.E.2d 738. Here, as in *In re A.C.*, virtually no evidence was presented by appellee regarding appellants' children and how they were being cared for. Id. at ¶ 15. "A finding of dependency must be rooted upon the question of whether the child is receiving proper care." *In re Burchfield* (1988), 51 Ohio App.3d 148, 156, 555 N.E.2d 325, citing *In re Campbell* (1983), 13 Ohio App.3d 34, 36, 13 OBR 36, 468 N.E.2d 93.

{¶ 60} Our decision is not made without an awareness of the rule that children do "*not* first have to be put into a particular environment before a court

can determine that that environment is unhealthy or unsafe." *In re Burchfield,* 51 Ohio App.3d at 156, 555 N.E.2d 325, citing *In re Campbell,* 13 Ohio App.3d at 36, 13 OBR 36, 468 N.E.2d 93. However, here the record is devoid of evidence that the environment that appellants provided for the children was unsafe for the children, apart from one later recanted admission by the mother, testified to by one caseworker, that the children had been present during domestic violence. Although the parents' alleged domestic violence may create an environment justifying state intervention pursuant to R.C. 2151.04(C), and although a single incident involving a parent may be enough to support an adjudication of dependency, *In re A.C.,* supra, the lack of details regarding the environment to which the children in this case were exposed and regarding any adverse impact the environment might have had upon the children renders an adjudication of dependency, on these facts, unsupportable. We are also aware of the deference due the trial court's determinations of credibility issues, especially in adjudication and custody cases. However, here, the trial court found incredible the parents' theories for the involvement of LCCS—theories that have little, if anything, to do with whether the children's environmental conditions or the parents' actions fell within the statutory purview. Thus, we find no clear and convincing evidence that supports the adjudication of these children as dependent as defined by R.C. 2151.04.

{¶ 61} For those reasons, appellants' first assignment of error is well taken regarding the adjudication of the children as dependent. Thus, appellant's second assignment of error is moot with respect to reasonable efforts and is well taken as to the transfer of custody. Since the adjudications were improper, the transfer of legal custody to the nonparent relative was an abuse of discretion.

{¶ 62} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed and remanded. Appellee is hereby ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.

Judgment reversed
and cause remanded.

SINGER, P.J., and PIETRYKOWSKI, J., concur.