[Cite as *In re M.R.*, 2020-Ohio-3648.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: M.R., K.R.1, J.R., K.R.2, and B.H. | : | APPEAL NO. C-190547 TRIAL NO. F16-1339X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  July 8, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jennifer Hengst,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Paul Hunt*, for Appellee Guardian ad Litem for M.R., K.R.1, J.R., K.R.2, and B.H.,

*Christopher P. Kapsal*, for Appellant Mother.

**ZAYAS, Judge.**

{¶1}   Appellant L.R. ("Mother") appeals from the judgment of the Hamilton County Juvenile Court adjudicating her five children—B.H., K.R.1, J.R., K.R.2, and M.R.—dependent and placing three of the children in the legal custody of their respective fathers and two of the children in the temporary custody of the Hamilton County Department of Job and Family Services ("HCJFS").  We reverse the juvenile court's judgment in part and remand the cause for further proceedings.

### Facts and Procedural History

{¶2}   The juvenile court first adjudicated B.H., K.R.1, J.R., and K.R.2 dependent and removed them from their mother's care in November 2017.[1]   This adjudication followed an incident of domestic violence between Mother and her eldest daughter, B.H., who was 12 years old at the time.  B.H. and Mother had gotten into an argument over chores that turned physical.  B.H. pulled out a knife and threatened to kill her mother and herself.  The incident was apparently witnessed by J.R., who reported being scared.

{¶3}   By all accounts, Mother has struggled to manage B.H.'s behavior throughout B.H.'s childhood.  B.H. has been diagnosed with post-traumatic stress disorder, attention deficit hyperactivity disorder, oppositional defiance disorder and mood disorder.  Following her 2017 dependency-adjudication, she was referred for a number of different agency services, including extensive mental-health treatment through HOPE for Children and Families ("HOPE"), family counseling, case management, psychiatric medication, and 60 hours of weekly in-home services.  While in temporary custody of the agency, she was placed in residential treatment at St. Joseph's Orphanage's Crisis Stabilization Unit.

---

[1] M.R. was not yet born.

{¶4}  In January 2018, K.R.1, J.R., and K.R.2 were returned to Mother under protective orders.  M.R. was born around this time.   The protective orders directed Mother to provide HCJFS and the guardian ad litem ("GAL") with reasonable access to her home and to K.R.1, J.R., and K.R.2.  The orders were to terminate by operation of law on August 25, 2018.

{¶5}  In April 2018, B.H. was returned to Mother under a protective order. This order directed Mother to provide HCJFS and the GAL with reasonable access to her home and to B.H., to comply with the HOPE services then in place, and to complete a domestic-violence assessment.  The order was to terminate by operation of law on April 24, 2019.

{¶6}  HCJFS subsequently filed a complaint in November 2018, claiming that all five children—B.H., K.R.1, J.R., K.R.2, and M.R.—were neglected and dependent, and moved for temporary custody.  The basis of the complaint was that B.H. was hospitalized for violent and aggressive behaviors since returning to Mother's care in April, and B.H. was charged with domestic violence against Mother in September.  B.H. allegedly punched Mother in the face several times and shoved her into a wall, damaging the drywall.  HCJFS also alleged that B.H. was frequently left to babysit her siblings while Mother was out and indicated that B.H. was recently charged with three counts of assault for an incident at her school.

{¶7}  The agency listed in its complaint two recent violent incidents involving Mother. On October 14, 2018, Mother was charged with domestic violence for injuring W.R., the father of K.R.2 and M.R., while at his home, and on October 29, 2018, Mother was stabbed by W.R.'s girlfriend while at his home again during a period for which W.R. had a temporary protective order ("TPO") against Mother.

3

HCJFS noted that it was unable to determine who was watching the children while Mother was at W.R.'s house during the second incident.

{¶8} In February and March 2019, a juvenile court magistrate conducted adjudication and dispositional hearings.

{¶9} P.S., maternal grandmother, testified that she was at Mother's home on the night of October 29 babysitting her grandchildren, and that she frequently babysat all of the children. Danielle Miller, a HCJFS caseworker, testified that 241-KIDS, Hamilton County's hotline to report suspected cases of child abuse or neglect, received a report that the children were left alone at Mother's home that night. Miller testified that the October 29 report was the only specific report the agency received regarding Mother leaving the children without supervision. The juvenile court made no finding on whether the children were indeed left without adult supervision that night or any other night, stating only, "the Court agrees with the Magistrate that it is unclear whether the children were being supervised by an adult on the night of the incident."

{¶10} Miller testified that she never had any concerns about the children's safety at Mother's home. She reported that during her visits, prior to October 2018, Mother was being more patient with the children. Miller stated, however, that B.H.'s behaviors were concerning, such as her kicking, spitting at, pushing, punching, and hitting Mother. Miller mentioned that Mother filed a complaint for domestic violence against B.H., but the charges were later dismissed. Miller also testified that Mother often diminished B.H.'s behavior, stating that there was nothing wrong, and that the behaviors that were reported about B.H. were not true.

{¶11} Mother testified as well. Mother stated that B.H. had behavioral issues as far back as she could remember. She confirmed that once B.H. was returned to

4

her care by HCJFS in April 2018, B.H. had been hospitalized approximately once per month at Children's Hospital for aggression and suicidal ideations. The hospitalizations lasted about a week or more. Mother indicated that she had taken B.H. to the hospital once or twice and that the police had taken her another time. B.H.'s school also transported her once after a violent episode at the school. Mother unequivocally denied the accuracy of a report from Children's Hospital that indicated that Mother told hospital staff she had to lock herself and the other children in a room and B.H. kicked the door down, and that she was scared of B.H. and feared for the safety of herself and her children. Mother testified that to keep her other children safe while Mother was having issues with B.H., she usually had them go to another room. Mother also stated that B.H. has never been aggressive towards her siblings.

{¶12} HCJFS moved to admit B.H.'s medical records with Mother's statements into the record, at which point Mother's counsel objected to "any hearsay within the medical records." The prosecuting attorney agreed with Mother's objection. The magistrate sustained Mother's objection and received the records into evidence, stating: "Okay. I mean I would take those out. I would admit those subject to that [objection]."

{¶13} Mother also briefly testified about her incidences of violence involving W.R. Mother indicated that she and W.R. were continuing a relationship while also trying to coparent their children. She said that he was convicted for domestic violence against her in 2017. She said that W.R.'s girlfriend was the mother of W.R.'s other child and that she was not supposed to be at W.R.'s the night Mother was stabbed by her. Mother generally characterized the incident as a misunderstanding, and explained that the original charge for domestic violence was pleaded down to

disorderly conduct. Miller described Mother's relationship with W.R. as a custody dispute. The bulk of the testimony regarding Mother's domestic-violence charge and the violation of a TPO regarded whether the children were left alone on the night Mother visited W.R.'s home.

{¶14} At the close of the evidence, and after denying Mother's motion to dismiss the agency's complaint, the magistrate adjudicated B.H., K.R.1, J.R., K.R.2, and M.R. dependent.

{¶15} Disposition immediately followed. A psychologist contracted by Family Access to Integrated Recovery, a program developed by HCJFS, testified, along with Mother and Miller. The psychologist indicated that Mother was generally uncooperative with his evaluation in that she minimized any negative experiences in her life. He ultimately recommended that Mother continue therapy.

{¶16} Miller testified that she had concerns with Mother's visits to B.H.'s residential treatment facility. Miller received multiple reports noting that Mother told B.H. to steal a staff member's cell phone and call 9-1-1, and that staff overheard Mother tell B.H. to refuse her medication. Miller stated that because B.H. was refusing her medication, she had threatened and tried to commit suicide several different times. Miller also noted that B.H.'s behavior at the facility was worse following Mother's visits. However, Miller said that the agency's goal for B.H. was to successfully complete residential treatment and return home to Mother. Miller talked with the facility about increasing the level of supervision when Mother visited with B.H. in an effort to deter Mother's inappropriate comments.

{¶17} Miller indicated that Mother's visitation with her children was never an issue. She could not recall a time where Mother had missed a visit or was late. However, Miller indicated that in her opinion a current safety risk to the children

was Mother's refusal to acknowledge that going to W.R.'s house in spite of a TPO was wrong.

{¶18}  Mother testified that all of her children have indicated that they want to return home and that they are well bonded.  Mother denied telling B.H. anything inappropriate during her visits at the residential treatment facility, even when pressed by the magistrate.  Mother said that she explained to the staff at the facility that B.H.'s current medication upset her stomach, and told them she had talked to B.H.'s doctor about changing the dosage.

{¶19}  Following the dispositional hearing, the magistrate committed B.H. and K.R.1 to the temporary custody of HCJFS.  J.R. was placed in the legal custody of his father, D.R., and K.R.2 and M.R. were place in the legal custody of their father, W.R.

{¶20}  Mother filed objections to the magistrate's decision.  The juvenile court overruled all of the objections and affirmed the decision of the magistrate.  Mother now appeals, asserting two assignments of error.

## Adjudication

{¶21}  In her first assignment of error, Mother argues that the juvenile court erred by adjudicating her children dependent, asserting that there was insufficient evidence to support the juvenile court's judgment and that the judgment was against the manifest weight of the evidence.  We agree with Mother that the dependency adjudication is unsupported with respect to K.R.1, J.R., K.R.2, and M.R., but hold that the adjudication is supported with respect to B.H.

{¶22} An adjudication of dependency must be supported by clear and convincing evidence.  *See* Juv.R. 29(E)(4).  "Clear and convincing evidence" is evidence sufficient to produce in the mind of the trier of fact a firm belief or

7

conviction as to the facts sought to be established. *In re Walling*, 1st Dist. Hamilton No. C-050646, 2006-Ohio-810, ¶ 15, citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. We "must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).

{¶23} In its decision, the juvenile court found the children dependent under R.C. 2151.04(C). R.C. 2151.04(C) states that a child is dependent where his or her "condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." This court has determined that "a finding of dependency under R.C. 2151.04 must be grounded on whether the children are receiving proper care and support. The focus is on the condition of the children, not the fault of the parents." *In re Bibb*, 70 Ohio App.2d 117, 120, 435 N.E.2d 96 (1980); *see In re Walling* at ¶ 16.

{¶24} Much of HCJFS's case focused on Mother's tendency to minimize the seriousness of B.H.'s behavior, Mother's violent incidences involving W.R., and whether Mother left her children alone on the night she visited W.R.'s house in violation of a TPO. On appeal, HCJFS and the children's GAL urge this court to presume harm to the children because of Mother's alleged conduct. But the Ohio Supreme Court has stated that such harm may not be inferred. *See In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979). For a determination of dependency under R.C. 2151.04(C), the conduct of a parent is relevant only insofar as that parent's conduct forms a part of the environment of the child at issue. *Id.* And "[a]s a part of the child's environment such conduct is only significant if it can be demonstrated to have an adverse impact upon the child sufficiently to warrant state intervention.

8

That impact cannot simply be left to inference, but must be specifically demonstrated in a clear and convincing manner." *Id.*

{¶25} HCJFS presented no evidence demonstrating how Mother's incidences of violence at W.R.'s home were harmful to the children. While there was clear and convincing evidence that Mother was initially charged with domestic violence and had violated a TPO, without evidence of some nexus between her action and resulting harm to the children, we cannot presume harm. *See Burrell* at 37, 39; *see also In re Walling*, 1st Dist. Hamilton No. C-050646, 2006-Ohio-810; *In re Holzwart*, 3d Dist. Seneca Nos. 13-04-32, 13-04-33, 13-04-34 and 13-04-40, 2005-Ohio-1602; *In re A.C.*, 9th Dist. Wayne Nos. 03CA0053, 03CA0054, and 03CA0050, 2004-Ohio-3285; *In re R.S.*, 9th Dist. Summit No. 21177, 2003-Ohio-1594; *In re Sweat*, 12th Dist. Warren No. CA86-06-040, 1987 WL 13054 (June 22, 1987).

{¶26} HCJFS also did not present clear and convincing evidence that Mother left her children alone on the night of October 29, 2018, when she was stabbed at W.R.'s house while violating a TPO, or on any other night. In fact, the juvenile court made no factual finding on whether Mother left her children alone on October 29, concluding only that the evidence was "unclear."

{¶27} HCJFS did however present clear and convincing evidence that B.H. is at risk in an environment in which Mother is directing her care. According to the testimony of Miller, the agency caseworker, and as evidenced by medical records from B.H.'s hospitalizations, B.H. continues to exhibit violent and aggressive behavior, including attempts at suicide, when she returns to her Mother's care. Mother's testimony that she just needs B.H. to utilize her coping mechanisms, while somewhat true, only lended support to the trial court's finding that Mother understates B.H.'s issues. Miller testified that B.H. needs intense services and

9

psychiatric medication. Miller said that Mother's minimization of B.H.'s behavior was evidence of a negative impact on B.H.'s environment because B.H. did not receive the care she needed to avoid escalations of her violent behavior. B.H.'s behavior got worse until Mother or B.H.'s school had to call the police to intervene. Additionally, Miller's testimony provided support for the notion that B.H.'s refusal to take her prescribed medication—something the juvenile court determined that Mother advised while visiting B.H. at her residential treatment facility—has a detrimental impact on B.H., as her attempts at suicide increased. *Compare In re Holzwart*, 3d Dist. Seneca No. 13-04-32, 2005-Ohio-1602, ¶ 12.

{¶28} While the medical records provided support for establishing the dependency of B.H., we decline to find that they provided clear and convincing evidence to establish the dependency of K.R.1, J.R., K.R.2, and M.R. As noted above, when the agency moved to admit B.H.'s medical records, Mother objected to inadmissible hearsay within these records. ("There must be strict adherence to the Rules of Evidence at the adjudicatory stage." *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 233, 479 N.E.2d 257 (1985).). The prosecuting attorney agreed with Mother's objection without any rebuttal argument, and the magistrate sustained Mother's objection. Nonetheless, the magistrate and the juvenile court relied upon hearsay portions of the medical records that had been excluded by the magistrate—Mother's statements to hospital staff on July 7, 2018 about Mother's concerns for the safety of her other children—to make a dependency finding. The juvenile court reasoned in its entry that the statements were made for the purpose of medical diagnosis or treatment, suggesting that the court found the statements to be an exception to the hearsay rule under Evid.R. 803(4). However, the medical-records exception "is generally applicable for the purpose of admitting statements made *by a patient*, *to a*

10

*doctor*, for the purpose of treatment." *Johnson v. Cassens Transport Co.*, 158 Ohio App.3d 193, 2004-Ohio-4011, 814 N.E.2d 545, ¶ 21 (3d Dist.). Here though, notwithstanding the magistrate's decision to broadly exclude hearsay within the records, the patient was B.H., not Mother, and HCJFS did not put forth an argument that Mother's statements were made for the purpose of B.H.'s treatment. Accordingly, the juvenile court's factual findings supporting its dependency adjudication were based on inadmissible hearsay. Mother unequivocally denied making the statements in the medical records during her testimony.

{¶29} This hearsay evidence was the only evidence the juvenile court relied upon to find with "firm belief or conviction" that K.R.1, J.R., K.R.2, and M.R. were in an environment that warranted state intervention. There was no corroborating evidence these children suffered physical or mental injury from July 7 occasion or any other, or that they otherwise had unmet needs. *See In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933, ¶ 95, citing *In re Alexander C.*, 164 Ohio App.3d 540, 2005-Ohio-6134, 843 N.E.2d 211, ¶ 58 (6th Dist.). In fact, Miller specifically testified that she never had any concerns about the children's safety at Mother's home. Without *some* admissible evidence that Mother's supervision of her other children or the environment of her other children has been affected in some negative way, there is not clear and convincing evidence of dependency. Therefore, we hold that the trial court erred in adjudicating these children dependent.

{¶30} In sum, because HCJFS failed to demonstrate by clear and convincing evidence that K.R.1, J.R., K.R.2, and M.R. were dependent, we reverse the juvenile court's judgment adjudicating the children dependent. We affirm that part of the juvenile court's judgment adjudicating B.H. dependent. The first assignment of error is sustained in part and overruled in part.

{¶31} The resolution of this assignment is dispositive of Mother's appeal as to K.R.1, J.R., K.R.2, and M.R.

**Disposition**

{¶32} In her second assignment of error, Mother claims that the juvenile court erred in failing to return her children to her custody. In light of our disposition of Mother's first assignment, we analyze this assignment only with respect to B.H.

{¶33} After a child is adjudicated dependent, the juvenile court has the discretion to choose from multiple dispositional options. R.C. 2151.353(A). These options include, among other things, committing the child to the temporary custody of the children-services agency, or awarding legal custody to a relative or any other person who has filed a petition for legal custody. *Id.* When choosing among these dispositional options, the juvenile court's focus is on the best interest of the child. *In re Allah*, 1st Dist. Hamilton No. C-040239, 2005-Ohio-1182, ¶ 10. "Although the statutory scheme does not delineate a specific set of factors or criteria that the juvenile court must apply when determining the best interests of a child in a legal-custody proceeding, this court has held that the factors set forth in R.C. 2151.414(D) are instructive." *In re A.W.*, 1st Dist. Hamilton No. C-140142, 2015-Ohio-489, ¶ 8, citing *In re A.C.*, 1st Dist. Hamilton No. C-140273, 2015-Ohio-153, ¶ 6. We have also held that the juvenile court may consider the factors in R.C. 3109.04(F), a statute applicable to custody matters in domestic relations courts. *In re D.M.*, 1st Dist. Hamilton No. C-140648, 2015-Ohio-3853, ¶ 12.

{¶34} "Because an award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities, appellate courts apply a preponderance of the evidence standard to the juvenile court's factual findings." *In re A.W.* at ¶ 9, citing R.C. 2151.353(A)(3)(c); *In re C.R.*, 108 Ohio St.3d 369, 2006-

Ohio-1191, 843 N.E.2d 1188, ¶ 17; *In re Perales*, 52 Ohio St.2d 89, 98, 369 N.E.2d 1047 (1977).

{¶35} We review a juvenile court's decision to grant legal custody for an abuse of discretion. *See In re A.C.* at ¶ 5. "An abuse of discretion connotes more than an error of law or judgment. It implies that the trial court's decision was unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A juvenile court's decision regarding a child's best interest in a legal-custody proceeding is not unreasonable if it is supported by competent, credible evidence. *In re A.W.* at ¶ 10, citing *In re Wilkenson*, 1st Dist. Hamilton No. C-010402, 2001 WL 1220026 (October 12, 2001).

{¶36} Despite Mother's arguments to the contrary, the record reflects competent, credible evidence upon which the trial court could have found that an award of temporary custody to HCJFS was in the best interest of B.H. Miller testified that the agency's goal is to keep B.H. in the residential treatment facility where she had made some progress until she is successfully discharged. As the juvenile court acknowledged in its decision, Mother has minimized B.H.'s behavioral problems and the evidence of her hospitalizations indicates that Mother is unable to appreciate the risk of caring for B.H. without intensive treatment, which includes continuing her psychiatric medication. Furthermore, as the juvenile court also noted, temporary custody of B.H. with the agency would allow Mother to complete individual counseling to address problems with acknowledging the seriousness of B.H.'s behavior.

{¶37} Given our review of the record, we conclude that there is competent, credible evidence to support the juvenile court's decision that B.H.'s best interest was

served by granting temporary custody to HCJFS. We, therefore, overrule Mother's second assignment of error.

## Conclusion

{¶38} For the foregoing reasons, we affirm the portion of the judgment of the juvenile court adjudicating B.H. dependent and committing her to the temporary custody of HCJFS, but reverse the portion of the judgment of the trial court adjudicating K.R.1, J.R., K.R.2, and M.R. dependent and committing them to the legal custody of HCJFS and their respective fathers. We hereby dismiss the dependency complaint as it pertains to K.R.1, J.R., K.R.2 and M.R.

Judgment accordingly.

**MOCK, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

14