[Cite as *In re Z.S.*, 2010-Ohio-1929.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
DEFIANCE COUNTY

IN THE MATTER OF:

    Z.S. (1),                       CASE NO. 4-09-20

NEGLECTED/DEPENDENT CHILD,

[DAVID SIEFKER,
    FATHER-APPELLANT],         O P I N I O N
[FAITH SIEFKER,
    MOTHER-APPELLANT].

IN THE MATTER OF:

    Z.S. (2),                       CASE NO. 4-09-21

NEGLECTED/DEPENDENT CHILD,

[DAVID SIEFKER,
    FATHER-APPELLANT],         O P I N I O N
[FAITH SIEFKER,
    MOTHER-APPELLANT].

IN THE MATTER OF:

    Z.S. (3),                       CASE NO. 4-09-22

NEGLECTED/DEPENDENT CHILD,

[DAVID SIEFKER,
    FATHER-APPELLANT],         O P I N I O N
[FAITH SIEFKER,
    MOTHER-APPELLANT].

**IN THE MATTER OF:**

    **Z.S. (4),**                  **CASE NO.  4-09-23**

**NEGLECTED/DEPENDENT CHILD,**

**[DAVID SIEFKER,**
    **FATHER-APPELLANT],**          **O P I N I O N**
**[FAITH SIEFKER,**
    **MOTHER-APPELLANT].**

**IN THE MATTER OF:**

    **Z.S. (5),**                  **CASE NO.  4-09-24**

**NEGLECTED/DEPENDENT CHILD,**

**[DAVID SIEFKER,**
    **FATHER-APPELLANT],**          **O P I N I O N**
**[FAITH SIEFKER,**
    **MOTHER-APPELLANT].**

**IN THE MATTER OF:**

    **Z.S. (6),**                  **CASE NO.  4-09-25**

**NEGLECTED/DEPENDENT CHILD,**

**[DAVID SIEFKER,**
    **FATHER-APPELLANT],**          **O P I N I O N**
**[FAITH SIEFKER,**
    **MOTHER-APPELLANT].**

Case No. 4-09-20, 21, 22, 23, 24 and 25

**Appeal from Defiance County Common Pleas Court
Juvenile Division
Trial Court Nos. 28729, 28730, 28731, 28732, 28733, 28734**

**Judgments Affirmed**

**Date of Decision:    May 3, 2010**

**APPEARANCES:**

*Terice A. Warncke*  **for Appellants**

*Russell R. Herman and Morris J. Murray*  **for Appellee**

**SHAW, J.**

{¶1} Father-appellant, David Siefker, and Mother-appellant, Faith Siefker, appeal the July 13, 2009 judgment of the Common Pleas Court, Juvenile Division, of Defiance County, Ohio, granting temporary custody of their six children, Z.S.1, Z.S.2, Z.S.3, Z.S.4, Z.S.5, and Z.S.6, to the Defiance County Department of Job & Family Services ("DJFS") following an adjudication that all six children were neglected and dependent.

{¶2} On October 27, 2007, DJFS received a call regarding concerns for the safety of the Siefker children. According to this caller, Mrs. Siefker was

hearing voices telling her to harm her children. The caller also indicated that the children were not allowed to leave the home for any extended period of time, were being left in high chairs for long periods of time, and were being home schooled through only the use of a Bible. As a result, DJFS sent Rob Elston, a case investigator, to the Siefker home to investigate this complaint.

{¶3} Upon arriving at approximately 11:00 a.m., Elston was greeted at the door by Mrs. Siefker. At that time, all of the Siefker children, except for the oldest, Z.S.1 (born December 4, 1999), were seated in high chairs. Mrs. Siefker informed Elston that the children were seated in their high chairs before Mr. Siefker left for work at 7:00 a.m. and remained in those chairs throughout the morning, with the exception of bathroom breaks or diaper changes. Elston learned that Z.S.1 suffers from autism, Z.S.2 (born March 2, 2001) suffers from a more severe form of autism, and Z.S.3 (born January 5, 2003) suffers from autism and is developmentally disabled due to a condition called hydrocephalus. As for the other three children, Z.S.4 and Z.S.5 (twins, born September 21, 2004) and Z.S.6 (born January 4, 2006) do not suffer from any mental or physical ailments.

{¶4} Mrs. Siefker admitted to Elston that shortly after the twins were born in 2004, she began hearing voices, sought treatment for this, and was diagnosed as bi-polar. However, she stated that she was no longer on medication for her bi-polar disorder because she had prayed to God, who healed her, and that she no

-4-

longer heard voices. Mrs. Siefker also informed Elston that she did not take her children into the community that often but that they would go into the backyard when it was warm outside. She allowed Elston to look around her home and informed them that the entire family slept in one bedroom because Z.S.2 and Z.S.3 had trouble sleeping throughout the night, which was alleviated by the family sleeping together.

{¶5} Elston returned to the Siefker home on October 30, 2007, after receiving a second complaint about Mrs. Siefker hearing voices and wanting to harm the children. This time, Elston and another caseworker, Amy Linebrink, went to the home, and Elston spoke with Mrs. Siefker while Linebrink spoke with Virginia Flores, a woman hired by the Siefkers to assist with the children and perform other household duties. After leaving the home, Elston returned to DJFS and spoke with his supervisor. The two decided that a safety plan needed to be devised, which included a mental health evaluation of Mrs. Siefker.

{¶6} Elston returned to the home later that evening when Mr. Siefker was also home. After discussing the matter with the Siefkers, they agreed to a voluntary case plan, whereby the children would stay with Mrs. Siefker's family until Mrs. Siefker could be given a mental health evaluation to determine whether the children were in danger of physical harm from her. Mrs. Siefker also agreed to follow any recommendations made by the evaluator. Elston was at the home for

approximately four and a half hours during which time the children, with the exception of Z.S.1, remained in their high chairs except for when it was each respective child's turn to bathe, use the bathroom, or have a diaper changed.

{¶7} For the next few days, the children stayed with Mrs. Siefker's family while she was attempting to have a mental health evaluation. This evaluation was performed by Dr. Melchor Mercado. Based on his observations and discussion with Mrs. Siefker, Dr. Mercado concluded that Mrs. Siefker was not experiencing any kind of psychosis and was not a threat to her children's physical well-being. However, Dr. Mercado did diagnose her as suffering from Obsessive Compulsive Disorder ("OCD") and recommended that she seek counseling. The children were returned to the Siefkers on November 2, 2007.

{¶8} On November 6, 2007, DJFS filed complaints for each child in the juvenile court, alleging that all six children were neglected and/or dependent and requesting that the children be placed in the protective supervision of DJFS. On November 21, 2007, the matter came on for hearing, and the Siefkers requested counsel, which was granted. At that time, the children were appointed a guardian ad litem ("GAL") and the Siefkers were appointed counsel.

{¶9} DJFS filed amended complaints in these cases on April 21, 2008. These amended complaints more specifically delineated the allegations of neglect and dependency and removed the term "psychotic" in describing Mrs. Siefker's

mental condition, which was a term used in the original complaints. The adjudicatory hearing was held on April 24, 2008, and June 23, 2008. During this hearing, the State presented the testimony of thirteen witnesses, including Dr. Mercado, case workers, and service providers. At the hearing, DJFS presented evidence that some of the children were being secured in their chairs through the use of hard, plastic zip ties. The Siefkers presented only one witness, Faith Siefker. After the conclusion of the hearing, the parties submitted proposed findings of fact and conclusions of law.

{¶10} On September 2, 2008, the trial court found "that the State has proven, to a clear and convincing level of evidence that these children are neglected." The court further found "that neglect is due to the mother's mental problems, and the father's lack of participation in the raising of these children." In addition, the court held that these "six children, but particularly the three oldest children, * * * because of their disabilities, lack adequate parental care by reason of the mental condition of the children's mother, which mental condition results in a situation where the child's condition or environment is such as to warrant the State and the interest of the children in assuming the children's guardianship." The court then found the children to also be dependent.

{¶11} By way of temporary orders, the court granted DJFS temporary supervision of the children but allowed them to remain in their parents' home.

However, the court ordered that the school-age children be enrolled in school, that the children not be withdrawn from school without the consent of the court, that the parents not unduly attempt to interfere with the school's methods and provisions of education of the children, that the children with special needs receive physical therapy at Defiance Regional Medical Center without interference by the parents as to the methods used by any licensed physical, speech, or other therapists until such time as the therapists deem therapy is no longer necessary, and that the use of the high chairs be limited to no more than sixty minutes in the morning and two later periods in the day exceeding no more than thirty minutes in duration each period and that the securing or cable tying of the straps on these chairs was not to be performed. The court also ordered that the parents undergo a complete psychiatric evaluation. After receiving a motion filed by the Siefkers, the trial court amended its temporary orders to permit the three older children to receive therapy through the Defiance City Schools and to allow the Siefkers to undergo their psychological evaluations after January 1, 2009.

{¶12} The psychological evaluations were performed by Dr. Wayne Graves, a clinical and forensic psychologist, on five different occasions in January and February of 2009. However, the report was not completed by Dr. Graves until April of 2009, largely due to the failure of the Siefkers to return their completed questionnaires to Dr. Graves for a significant amount of time.

{¶13} On March 16, 2009, DJFS filed motions to show cause in the respective cases as to why the Siefkers should not be held in contempt for violating the court's temporary orders of September 2, 2008. In these motions, DJFS alleged that Mrs. Siefker withdrew her three oldest children from school on March 10, 2009, and informed her caseworker that she would not allow her children to return to school. These motions were scheduled to be heard on April 2, 2009. On that date, the Siefkers' attorney requested that he be allowed to withdraw as counsel of record because of a potential conflict of interest between Mr. and Mrs. Siefkers' respective interests. The court granted this request and appointed new and separate attorneys to the Siefkers. The motions to show cause were then re-set for hearing on the same day as the dispositional hearing in these cases.

{¶14} The contempt/dispositional hearings for these cases were held on June 18 and 19, 2009. At that time, DJFS presented the testimony of five witnesses and both Mr. and Mrs. Siefker testified on their own behalves. After hearing the evidence, the court informed the parties that it would render its decision as to disposition on June 29, 2009, at 4:00 p.m., and that all parties needed to be present that day. A written notice of this date and the scheduled time was also sent to the parties. However, the Siefkers did not appear as scheduled,

and bench warrants were issued. The hearing was rescheduled to the following day, and the Siefkers did appear.

{¶15} At that time, the court found both Mr. and Mrs. Siefker in contempt of court. The court then held that the children would be placed in the protective supervision of DJFS and that the case plan submitted by DJFS in regards to the children would be adopted by the court.

{¶16} The court found that the children could remain in their home but that (1) the three oldest children would attend a public or parochial school, where specialized education is available to meet their specialized needs, including a program of physical, occupational, and speech therapy; (2) the school district shall not allow the parents to unduly interfere in the methods or course of study used by the district; (3) that upon the three younger children attaining the age of six (the age at which the mandatory school laws begin), they be educated but that the Siefkers could home-school these children if they followed Ohio law, which requires them to choose an education curriculum and have it approved in advance of the first day of school by the school superintendent and to then teach that approved curriculum to the three younger children; (4) that the three younger children be tested each May based on the approved curriculum by the district and that as long as they score sixty-seven percent or higher they may continue to be taught at home; however, if they failed to attain this score or higher, they would

have to attend public school the succeeding years; (5) that the children's family doctor would not be changed without notice to DJFS and the signing of appropriate medical releases; (6) that the children not be truant; and (7) that the children be ready for school when the bus arrives.

{¶17} After advising the parents of this disposition, the court informed the parents that the children had a right to develop to their maximum potential and to a useful education as it relates to the world in which they will have to live. The court also informed the parents that there were no restrictions on what they could teach their children at home. However, the court stated that it wanted to ensure that its orders were followed and then asked Mrs. Siefker if she would comply with the orders. When she indicated that she would not, the court vacated its previously ordered disposition and awarded temporary custody of all six children to DJFS.

{¶18} Counsel for Mr. Siefker then requested that the court make inquiry of his client as to whether he would comply with the court's order. The court apologized for failing to do so and asked Mr. Siefker if he would follow the previously stated orders of the court. Mr. Siefker replied, "We had stated that we would unify in our defense." The court again granted temporary custody to DJFS but determined that the children would not be removed from the home until August 1, 2009, and that it would allow the parents to change their minds

regarding following the court's orders to avoid having the children removed from their home. The Siefkers did not change their minds about whether they would follow the court's orders, and DJFS gained temporary custody of the children.

{¶19} This appeal followed, and the Siefkers now assert two assignments of error.

### ASSIGNMENT OF ERROR I

**THE JUVENILE COURT COMMITTED REVERSIBLE ERROR WHEN IT FOUND APPELLANTS' CHILDREN TO BE DEPENDENT AGAINST BOTH THE MANIFEST WEIGHT OF THE EVIDENCE & THE BEST INTERESTS OF THE CHILDREN BECAUSE THE STATE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT A PARENT HAD A MENTAL CONDITION THAT CAUSED THE SIX (6) CHILDREN TO LACK ADEQUATE PARENTAL CARE OR THAT THEIR ENVIRONMENT OR CONDITIONS WARRANTED THE STATE TO ASSUME GUARDIANSHIP.**

### ASSIGNMENT OF ERROR II

**BY ITS OWN JUDGMENT ENTRY DATED SEPTEMBER 2, 2008, THE JUVENILE COURT ERRONEOUSLY FOUND APPELLANTS' CHILDREN TO BE DEPENDENT CHILDREN BECAUSE IT MISAPPLIED THE LAW TO THE FACTS IN THIS CASE AND APPLIED INCORRECT LAW IN PART TO ITS FINDING OF DEPENDENCY & THUS VIOLATED APPELLANTS' RIGHTS TO FREEDOM OF RELIGION & TO DIRECT THE NURTURING & EDUCATION OF THEIR CHILDREN UNDER THE OHIO AND U.S. CONSTITUTIONS.**

{¶20} The issues presented by both of these assignments of error are intertwined. As such, we elect to address the two assignments of error together.

{¶21} The Siefkers assert that the trial court erred in finding that their six children were dependent because DJFS failed to demonstrate this allegation to a clear and convincing standard of proof. Specifically, the Siefkers maintain that the evidence did not establish that Mrs. Siefker had a current mental condition that resulted in the children lacking adequate parental care or that the children's condition or environment was such as to warrant the state to assume their guardianship. Further, the Siefkers contend that the trial court erred by misapplying the law regarding a finding of neglect to support its finding of dependency. Lastly, the Siefkers assert that the trial court erred in its adjudication and disposition of the cases by awarding temporary custody of the children to DJFS, particularly in regards to Mr. Siefker, whose actions, they assert, were not given due consideration. In support of these assertions, the Siefkers maintain that the trial court impermissibly based its decisions on its dislike/discomfort with their religious beliefs and their choosing to raise and educate their children in accordance with those beliefs. Thus, they contend that the trial court impermissibly infringed upon their freedom to exercise their religion and to raise their children in accordance with those religious beliefs.

{¶22} Our review of this matter begins by noting that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic civil right.'" *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing *In re Murray*

(1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. Thus, "a parent's right to the custody of his or her child has been deemed 'paramount'" when the parent is a suitable person. *Id.* Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "protected by law and, thus, comes within the purview of a 'substantial right[.]'" *In re Murray* at 157, 556 N.E.2d 1169. Based upon these principles, the Ohio Supreme Court has determined that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes* at 48, 679 N.E.2d 680. Further, we are guided by R.C. 2151.01(A), which sets out the purposes of R.C. Chapter 2151 relevant here:

> **To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code, whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety[.]**

See *In re Riddle*, 79 Ohio St.3d 259, 262, 680 N.E.2d 1227, 1997-Ohio-391. Thus, it is within these constructs that we now examine the findings and determinations made in the lower court.

{¶23} A finding of neglect or dependency must be supported by clear and convincing evidence. R.C. 2151.35. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v.*

*Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118. Further, "[i]t is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id*., citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493. In *Cross*, the Ohio Supreme Court further held:

> **Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. * * * The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.**

*Cross*, 161 Ohio St. at 477-478, 120 N.E.2d 118 (internal citations omitted). Once the clear and convincing standard has been met to the satisfaction of the trial court, "the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613, citing *Cross*, supra. "The determination of the [trial] court should not be overturned unless it is unsupported by clear and convincing evidence." *In re Adoption of Holcomb*, supra.

{¶24} The sections of the Revised Code under which DJFS brought its dependency actions, R.C. 2151.04(B) and (C), state that a "dependent child" means any child:

> **(B)  Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian; [or]**
>
> **(C)  Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]**

In contrast, the sections of the Revised Code under which DJFS brought its neglect actions, R.C. 2151.03(A)(2), (3), and (4), state that a "neglected child" means any child:

> **(2)  Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian;**
>
> **(3)  Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;**
>
> **(4)  Whose parents, guardian, or custodian neglects the child or refuses to provide the special care made necessary by the child's mental condition[.]**

{¶25} The Ohio Supreme Court has held that a finding of neglect based upon "R.C. 2151.03(A)(2) requires some showing that parents, a guardian, or a custodian is at fault before a finding of a lack of proper (or adequate) care can be made." *In re Riddle*, 79 Ohio St.3d at 262, 680 N.E.2d 1227.  However, the focus

of the dependency allegation is on the child and the child's condition, not on the faults of the parents. *Id*. Nevertheless, the conduct of a parent is relevant insofar as it forms a part of the children's environment. *In re Burrell* (1979), 58 Ohio St.2d 37, 39, 388 N.E.2d 738; *In re Alexander C.*, 164 Ohio App.3d 540, 843 N.E.2d 211, 2005-Ohio-6134, at ¶ 51. "'The parent's conduct is significant if it is demonstrated to have an adverse impact on the child sufficient to warrant state intervention.'" *In re Alexander C.*, supra, quoting *In re Ohm*, 4th Dist. No. 05CA1, 2005-Ohio-3500, at ¶ 21.

{¶26} When a child is receiving proper care from her parents, then the child is not a dependent child. *In re Riddle*, supra; see, also, *In re Utz*, 3rd Dist. No. 3-2000-06, 2000-Ohio-1710. However, while the child's present "condition or environment" is the focus of a dependency determination, "'the law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm.'" *In re Burchfield* (1988), 51 Ohio App.3d 148, 156, 555 N.E.2d 325, quoting *In re Bishop* (1987), 36 Ohio App.3d 123, 126, 521 N.E.2d 838.

{¶27} In the present case, the testimony revealed that at the time of the adjudicatory hearing on the complaints in these cases, the youngest five children were seated in high chairs, often with restraints, for the majority of their waking hours every day, which amounted to approximately eight to ten hours. Often the

children were seated in these chairs for three to four hours at a time except for bathroom breaks or diaper changes or to perform their assigned task at meal times. For instance, Z.S.2 assisted Mrs. Siefker in pouring the orange juice for the others at breakfast but then was returned to her seat.

{¶28} When the on-going case worker, Scott Allomong made an unannounced visit to the Siefker home one morning, he found the same five children in their high chairs, each restrained in their chairs with harnesses. In addition, Z.S.2's arms were held down by an additional restraint and the twins, Z.S.4 and Z.S.5, had hard, plastic zip ties placed through the buckle of their harnesses. Mrs. Siefker informed Allomong that she placed the zip ties on the twins so they could not climb out of their chairs as they had learned to do. She also told Allomong that she kept the children in the chairs because Z.S.2 and Z.S.3 would run all over the place if she did not restrain them. Further, Z.S.2's and Z.S.3's chairs were bolted to a wooden frame to keep them from tipping due to the fact that these children sometimes rocked themselves violently.

{¶29} When Allomong returned later that same evening, the children were once again in their high chairs. However, Z.S.2 no longer had her arms restrained, and one of the twins was asleep in his chair with a blanket over his head. Mrs. Siefker never explained why the three younger children, who had no mental

deficiencies, were subjected to the same amount of high chair seating/restraint as the two special needs children.

{¶30} Virginia Flores, the woman hired by the Siefkers to help in the home, testified that she began working for the family in December of 2005, when Mrs. Siefker was eight months pregnant with Z.S.6. Initially, she worked from 2:45 p.m. until 7:30 p.m., but at the time of the hearing in April of 2008, she was working in the home from 9:00 a.m. until 2:45-3:00 p.m. Flores testified that the children were placed in their chairs shortly after each awoke in the morning for approximately four hours for breakfast and placed back in the chairs for three to four hours for dinner.

{¶31} She also testified that she used to wear sweatpants to work but that approximately three weeks before the adjudicatory hearing commenced, Mrs. Siefker had required her to wear a dress with long sleeves and with a hem that went below her knees. Flores further testified that Mr. Siefker used to have video games and a television in the garage that he would use but that those were now gone as were any of the children's toys that Mrs. Siefker determined were not realistic. For instance, Mrs. Siefker disposed of a toy fire truck that had a smiley face on it because that is not how a real fire truck looks. Also, for example, Flores was told by Mrs. Siefker to dispose of any flash cards for the children that did not

realistically depict the objects that they represented, such as a drawing of a robin that was purple with stripes because that is not how a real robin looks.

**{¶32}** Flores further stated that the children had not left the home for approximately six months except to go to a doctor's appointment, but that the children were allowed to play in the backyard during the warmer months. During the morning when the children were in their high chairs, Flores and Mrs. Siefker engaged in various household chores, including feeding the children breakfast, and Mrs. Siefker also gave them a Biblical lesson. The use of high chairs for extended periods of time enabled Mrs. Siefker to adhere to her daily routine.

**{¶33}** Additionally, the clocks in the Siefker home do not reflect the Coordinated Universal Time based upon the use of atomic clocks, which is the standard used throughout the world. Rather, Mrs. Siefker utilizes her own version of time, which consists of twelve hours that she asserts are the hours designated by God, and teaches this time to the children. The Siefkers also use and teach to the children the Hebrew calendar rather than the Gregorian calendar and refer to the days of the week as the first day, second day, etc., rather than Sunday, Monday, Tuesday, etc.

**{¶34}** The only toys in the home are building blocks and Tupperware containers, and the only books available to the children are the original King James versions of the Bible and notebooks wherein Mrs. Siefker has re-written the

books of the Bible. The home is devoid of any outside stimuli, and the children have no interaction with others with the exception of a handful of times when some neighborhood children were allowed to play with the Siefker children, the occasions where Flores brought her children to the home, and when additional care providers would enter the home. The testimony also revealed that the highlight of the children's week was when the garbage men came to take the family's trash and the Schwann's man delivered food.

{¶35} Various education and therapy providers have been utilized to help educate and provide therapy to the three oldest children, most of which Mrs. Siefker insisted occur at the family's home. However, Mrs. Siefker would not allow them to begin until whatever routine in which she was engaged was completed, often delaying the start time by thirty minutes to an hour. For instance, if she was cleaning the kitchen and the children were done with their snack, she would insist upon completing her task before taking any of the children out of their chairs and allowing them to begin their lessons and/or therapy. Mrs. Siefker also censored all materials and activities that these providers attempted to use with the children. For instance, the therapist attempted to encourage the children by telling them that they did a good job, but this was seen as prideful rather than meek, as God requires according to Mrs. Siefker, and the therapist was not

permitted by Mrs. Siefker to say those things to the children, despite the fact that the therapist viewed this as positive reinforcement.

{¶36} Furthermore, with so many children in the home, the providers had a difficult time getting the children to focus. Therefore, both the education and therapy providers felt that they achieved everything they could with the children in the home but that the children needed to continue their education and therapy outside of the home where the providers could have access to more and varying materials and maintain an environment more conducive to productivity. However, Mrs. Siefker did not allow this because she did not believe the children were ready, despite the opinions of the trained providers, but she could not articulate when she thought they would be ready. Another suggestion was also made to the Siefkers that the three younger children be placed in day care a few days a week to allow Mrs. Siefker some time to concentrate on the older children's educational and therapeutic needs but Mrs. Siefker did not feel comfortable with having these children leave the home either.

{¶37} Mrs. Siefker's mother, Wendy Draime, testified that when the children stayed with her while Mrs. Siefker was being evaluated, they were all able to sleep without any problems and she had no problems with their behavior even though she did not use any type of high chair and/or restraints on them. She further testified that her daughter did not allow the children to use their

imagination, such as pretending to be firemen. Mrs. Siefker's stated reason for that was because it was against God's will. She and her mother argued about this a few weeks before the adjudicatory hearing, and her mother told her she needed to get professional help, prompting Mrs. Siefker to order Draime to leave her house. Draime testified that Mrs. Siefker was becoming more radical in her beliefs, causing Draime to suspect that Mrs. Siefker was pregnant. Draime testified that she had this suspicion because her daughter was always more erratic in her belief system when pregnant. This suspicion was confirmed at the adjudicatory hearing when Draime learned that Mrs. Siefker was pregnant.[1]

{¶38} Draime also testified that her daughter has had mental health problems for years and she has tried to encourage her to seek professional help. She further stated that Mr. Siefker has complained to her that his wife will not listen to him and that she is out of control, but when she asked him if he thought Mrs. Siefker was too disturbed to raise the children, he said that his wife was fine.

{¶39} Draime further stated that the fire truck with the smiley face that was thrown out by Mrs. Siefker was a toy she bought for the children because Mrs. Siefker expressly requested it, including showing Draime a picture of it in a magazine, but that the children told her their mother threw it away because it was

---

[1] The filings indicate that this pregnancy did not result in a live birth. However, Mrs. Siefker was also pregnant at the dispositional hearing a number of months later, and the filings indicate that she gave birth to this child, who now resides with Mr. Siefker and his parents and is not one of the children involved in the instant appeal.

evil. Draime also testified that she had Z.S.2 for one summer when Mrs. Siefker was pregnant with the twins and that Z.S.2 improved in her speaking, eye contact, and expressiveness but that she has worsened since that summer. She further stated that her daughter cannot do everything herself but when help comes, Mrs. Siefker does not let it come in the way it needs to come and the children are learning nothing. In addition, Draime testified that the need for routine was for Mrs. Siefker's benefit, not the children's, and that Mrs. Siefker would have an anxiety attack if she did not complete her routine. Further, she believed that her daughter's concerns were not religious issues but mental issues, particularly the need for her children to depend on her and her alone and the need for control. She also testified that the children were not allowed to make any choices but were told what to do, when to do it, and where to do it by Mrs. Siefker.

{¶40} Throughout her testimony, Draime testified that her daughter was loving and kind and that she loved her children. However, she repeatedly stated that her daughter needed professional help for the mental health issues she has had for years. While she stated that she respected a number of things that Mrs. Siefker had a religious viewpoint on and did not go against her daughter's wishes about what the children are exposed to, she also consistently and repeatedly stated that a lot of Mrs. Siefker's behaviors and attitudes towards things were based on her

need to maintain order and to keep her routine for her own sake, not those of the children.

**{¶41}** Mrs. Siefker testified on her own behalf. She stated that she is a Christian but not any specific denomination. However, she has not attended a church since 2004, and neither have her children because no church seemed to hold her same beliefs and views and often did things of which she disapproved. She also testified that the pastor of one of the last churches she attended had "leavened" her home. Specifically, in 2007, he brought her Bibles (the new King James version), Christmas candy for her children (the Siefkers do not celebrate Christmas), and audio cassettes of the Bible being read (she does not believe in people acting as if they are Christ), knowing she did not agree with these things. Thus, she became suspicious of his motives and concluded that he was providing information to DJFS, which she noted occurred on the eve of Halloween, an evil holiday, through the items he brought to her home.

**{¶42}** Mrs. Siefker stated that Dr. Gupta was her treating psychiatrist from 1997-2003, that he diagnosed her as suffering from bi-polar disorder, and that he put her on medication for this, which she took for five years. She testified that she stopped taking the medicine after praying to God for healing, consulting with Dr. Gupta, and changing her diet, excluding all refined sugars and refined grains. She further testified that she had not heard voices for a number of years. However, she

also admitted that she had never told Dr. Gupta that she had heard voices telling her to put her children in the oven. Dr. Mercado also did not recall Mrs. Siefker informing him that she had heard voices telling her to harm her children, but Mrs. Siefker testified that she had told him this information. As for Dr. Mercado's recommendation that she seek additional counseling, Mrs. Siefker went to see Dr. David Deal one time but did not return because he had an item on his table that she believed to be associated with witchcraft. She also admitted that she had not sought counseling from someone else, including Dr. Gupta or Dr. Bonnie Kaufmann, a psychologist who had counseled her and referred her to Dr. Gupta in 1997, despite having agreed to follow any recommendations of Dr. Mercado and agreeing with his diagnosis of OCD and depression.

{¶43} Mrs. Siefker, who has a bachelor's degree in English secondary education, testified that she home-schools her children using the English and Spanish version of the King James Bible and flash cards using words found in the Bible. She also testified to utilizing different methods to teach her children with disabilities but that she had never submitted them to the school superintendent for approval. At one time, she enrolled the children in public school at her mother's urging but withdrew them when she saw how the school was decorated and her husband informed her that her mother was not going to tell them how to raise their children.

{¶44} She further testified that she asked the in-home providers to wear certain clothing and censored what and how they taught and worked with her children because she wanted to control what happened in her home. However, Mrs. Siefker also stated that she had enrolled the three oldest children in school for the fall after praying about it. She testified that she understood that things would be different in school and she would not expect to have the same restrictions on teachers and therapists at school as at home. She also admitted that she did not take the children anywhere other than to a doctor's appointment or to play in their backyard so that they would not be exposed to anything, such as a picture, cartoon, or manner of dress, of which she did not approve.

{¶45} Nearly everything that Mrs. Siefker did by way of educating and censoring all exposure her children had to the world, according to her, was based on her religious beliefs. However, while she made references to certain passages in the Bible, she did not identify any specific tenets of her faith and was unable to identify anyone or any other group that believed as she did or held beliefs *similar* to hers. Further, she never explained by way of her religious beliefs or otherwise why *all* the children had to be seated in high chairs for long periods of time, why *all* the children had to sleep together with their parents, or why she did not adjust her routine to accommodate her children's education and therapy.

{¶46} Based upon all of this testimony, the trial court found that Mrs. Siefker had a history of mental problems, including being diagnosed with major depressive disorder and bi-polar disorder, that she had not followed through with medication and/or counseling for these disorders, and that confining the children to their high chairs made Mrs. Siefker's obsessive compulsion to maintain this routine easier. Further, the court found that the therapy had been continually interrupted by Mrs. Siefker to the point of being rendered useless and that she no longer took her children to therapy at the hospital because they might see something with which she disagreed. Thus, the court found that all the children were, essentially, caged and that they had no socialization except with their immediate family. The court also found that the older children had been seriously neglected from an educational standpoint because no one was allowed to begin the children's lesson until her routine was complete and she censored everything they did and saw, essentially rendering these services useless as well. The court further found that harm had occurred to the children due to the "limited therapeutic, educational, and socialization opportunities as well as the opportunity to simply be children moving about."

{¶47} Although Mr. Siefker did not testify, Mrs. Siefker testified that various things she did were after speaking to her husband or how "they" felt about things. The testimony, including Mrs. Siefker's, revealed that Mr. Siefker was

employed, taking him out of the home several hours of the day, but often provided her little assistance in taking care of the six children when he was home and that he would leave the home or go to the garage when he was not working. This testimony was supported by other witnesses as well, including Draime who testified that Mrs. Siefker complained to her about Mr. Siefker's lack of assistance and support. Therefore, the trial court found that Mr. Siefker was withdrawn from the family and unable to "get through the solid wall of [Mrs. Siefker's] mental condition."

{¶48} As a result, the court found by clear and convincing evidence that all six children were neglected and that Mrs. Siefker's mental condition did not allow her to recognize the harm she is doing to her children. Specifically, the court found that Mrs. Siefker believed that she was doing what was right because she justified everything upon "an incomprehensible religious doctrine, arrived at individually, not related to any recognized tenet or denomination, and zealously embraced to the point of summarily excluding all other reason." The court further found that the children were being stunted in their development to the point of serious harm. The court then found that the neglect was due to Mrs. Siefker's mental problems and Mr. Siefker's lack of participation in the raising of the children.

{¶49} However, the court did not end its determination there. The court further explained that the children were also dependent because they lacked adequate parental care by reason of the mental condition of their mother, which condition resulted in a situation where the children's "condition or environment is such as to warrant the State and the interest of the children in assuming the children's guardianship."

{¶50} Having reviewed the evidence, as detailed above, we cannot find that the trial court erred in finding that the children were neglected and dependent.[2] There was clear and convincing evidence that Mrs. Siefker's faults and/or habits in refusing to allow her children to be exposed to anything in the world in which they will have to live that she did not approve of is harmful to their educational, developmental, and emotional well being. Further, the testimony revealed that Mr. Siefker was either incapable or unwilling to ensure that his children were not harmed by his wife's need for routine and control of her and their children's surroundings. Further, the evidence was sufficient to warrant a firm belief or conviction on the part of the trial court to find that Mrs. Siefker's mental condition prevented her from realizing the harm she was doing to her

---

[2] The trial court's entries specifically state that the court finds by clear and convincing evidence that the children are neglected but does not put the word neglected in all capital letters unlike its finding that the children are dependent, which was capitalized. Thus, the parties seem to believe that these cases only involved findings of dependency. However, our review of this entry reveals that the trial court found the children to be dependent, as defined in R.C. 2151.04(B) and (C), **AND** neglected, as defined in R.C. 2151.03(A)(2) and (3).

children such as to warrant the State to assume their guardianship to ensure that they received adequate parental care.

**{¶51}** As for the disposition of these cases, "the trial court must evaluate all of the dispositional alternatives and decide which one best serves the interests of the child." *In re Hauenstein*, 3rd Dist. Nos. 5-03-38, 5-03-39, 2004-Ohio-2915, at ¶ 20, citing *In Re Holtgreven* (June 23, 1995), 3rd Dist. No. 5-95-7, unreported, 1995 WL 368841; *In Re Pieper Children* (1993), 85 Ohio App.3d 318, 322, 619 N.E.2d 1059. One option available to the court is the placement of the child in the temporary custody of a public children services agency. R.C. 2151.353(A)(2). Prior to awarding temporary custody to DJFS, "the trial court must find that [DJFS] used reasonable efforts to avoid the removal of the children from the home." *In re Hauenstein*, supra, citing R.C. 2515.353(H). However, "[a] reviewing court will not reverse the trial court's decision at this dispositional stage as being against the manifest weight of the evidence if it is supported by competent and credible evidence." *In re Holtgreven*, supra, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. Further, a court exercising jurisdiction over the custody and welfare of children has a great deal of discretion. *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13, 106 N.E.2d 772.

{¶52} At the time of the disposition in this case, the three oldest children were enrolled in Defiance City Schools. The school arranged for them to be in their own classroom, specifically designed as a "self-contained autism unit," with teachers and aides to continuously help them. In October of 2008, Virginia Flores was hired by the school at the request of Mrs. Siefker to also be an aide for the children. Not only did the children receive educational services, they also received physical, occupation, and speech therapy.

{¶53} Before the school year began, the primary teacher, Laura Smith, went to the Siefkers' home to discuss the education of the children. During this meeting, Mrs. Siefker told Smith about various things to which she did not want her children exposed, including a heart necklace that Smith was wearing on that occasion because she did not approve of that shape. She further instructed Smith that she preferred Smith and other women to wear a head covering and shirts that were not revealing. Smith agreed that they would wear aprons if their necklines became an issue for Mrs. Siefker but that they would not wear head coverings.

{¶54} Mrs. Siefker also came to the classroom when Smith was decorating it for the start of the school year. Mrs. Siefker did not approve of some crayon cut-outs that had smiley faces on them, so Smith removed them. She also told Smith that the name plates she had could not be used because there was a swirl design on the border, which Mrs. Siefker asserted was a sign of witchcraft. The

school ordered books to use with the children that contained real life photographs to accommodate the Siefkers' preference that their children only be exposed to realistic objects. The school also ordered high chairs for the children that were specifically requested by the Siefkers. However, after a few days of using them and being concerned that if the children rocked hard enough they might tip the chairs over and harm themselves, Smith stopped using the chairs. She found that the children were able to sit at their own desks during their lessons and at a table to eat without any problems.

{¶55} In addition, Mrs. Siefker insisted on censoring everything the children were taught. She went through all of Smith's teaching materials, such as note cards, flash cards, etc., and informed Smith of the ones she approved and disapproved. She would also periodically go through these materials during the school year, and at times, would disapprove of some item that she had previously approved.

{¶56} Mrs. Siefker initially came with the children to school for the first few weeks. After this time, a bus provided the Siefker children transportation to and from school. However, the bus often had to wait anywhere from ten to forty-five minutes for them because the Siefkers did not have them ready when the bus arrived, which cut into both their therapy and academic times.

{¶57} Initially, the Siefkers permitted their children to participate in music time, which Smith testified was particularly beneficial and enjoyable for autistic children. During music time, they would sing songs and use different musical instruments. At some point, Smith sent a CD of 100 songs, complete with the lyrics, to the Siefkers for approval, but Mrs. Siefker did not approve of any of them. For instance, one of the songs, "Old MacDonald Had a Farm," was disapproved because Smith could not prove to Mrs. Siefker that there ever was a person named Old MacDonald who had a farm and where he lived. Thus, she considered this to be untruthful, and she would not allow her children to be taught lies. Eventually, Mrs. Siefker allowed Smith to use a few songs, such as "Head and Shoulders, Knees and Toes," because those were actual body parts.

{¶58} Z.S.1 was also allowed to walk to the cafeteria with a staff member to get lunch for the class. He was able to say hello to other students in the hallway and even had a bit of conversation with another boy about his same age. Z.S.1 enjoyed this very much and would become upset if he was not able to go to the cafeteria for some reason. However, Mrs. Siefker stopped this activity when she learned that a poster of "High School Musical" was hanging above the cafeteria entrance because she felt the people in the poster were dressed inappropriately.

{¶59} In December of 2008, another child, a girl, was placed in the autism classroom with the Siefker children. In addition, the classroom was moved from a

space in the basement to a class upstairs. With the addition of the other child came materials for her that were not approved by Mrs. Siefker, such as regular children's books and a book bag with a picture of the Disney cartoon "The Little Mermaid." Thus, Mrs. Siefker requested that her children not be exposed to the new student's things. Smith complied with this request and put the Siefker children in a workspace away from the new student. Smith also put photographs of the children with the words "Our Class" on the door to her classroom, but Mrs. Siefker insisted that the photograph of the new student be removed because her neck was exposed and she was not wearing a head covering.

{¶60} One day in February of 2009, Z.S.2 came to school with a fever. After she vomited, Smith sent her home. Smith had sent Z.S.3 home on a previous day for the same conditions. Mrs. Siefker informed Smith on both occasions that the children were not contagious but that they were ill because they had been exposed to sin. She further told Smith that if any other children became ill, it was because they, too, had been exposed to sin. Therefore, Mrs. Siefker requested that the children not be sent home. However, many other children at school were sick, and it appeared to Smith that some type of stomach flu was going around the school.

{¶61} The following day, the Siefker children were not present at school. However, Mrs. Siefker came to the class and went through Smith's teaching

materials that she had previously approved. While Mrs. Siefker was at the school, Mr. Siefker called a number of times asking his wife to come home to help take care of the kids. He also called an additional time to ask her to come home because he was now sick, but she did not leave.

{¶62} Instead, Mrs. Siefker continued to review the materials she had previously approved. She made a stack of various materials of which she did not approve, and Smith questioned her as to why these materials were no longer acceptable. Smith also told Mrs. Siefker that she wanted to teach Z.S.1 about literature, specifically setting, plot, and characters, and then question him about what would happen next in the story. She asked Mrs. Siefker if she could create stories to do this, but Mrs. Siefker said that she could not because that would be a lie, even if the stories were made up about Smith's own daughter, who is, obviously, a real person. Mrs. Siefker then suggested that Smith utilize the Bible to accomplish this because Mrs. Siefker knew the Bible was real. When Smith informed her that she could not and would not teach the Bible in school, Mrs. Siefker became very upset and more confrontational than Smith had ever previously seen.

{¶63} Smith further questioned Mrs. Siefker as to why she kept changing her mind about what was acceptable to teach and what was not and expressed that she felt like she was constantly a step behind because she could not stay on top of

what the rules were due to Mrs. Siefker's constant changes. At that point, Mrs. Siefker told Smith that she did not always know the new rules that God was going to give her, that the rules were always changing because God is constantly giving her new directions, and that is how it is when God establishes a new religion, which God was doing with her. Smith testified that she then "backed off" and ended the conversation.

{¶64} According to Smith, "[e]verything spiraled from there." The children's attendance began to be sporadic, particularly Z.S.1's. Smith testified that after the day that the children were sent home sick, Z.S.1, who had enjoyed school, became much more anxious around the school staff, particularly anyone who became sick, his breathing would become heavy, he was a little clammy, and he would pace. He would also comment to Smith that she needed to ask for forgiveness so she would not feel sick again because her sins had made her sick.

{¶65} Mrs. Siefker also demanded that the clock hanging on the wall in the new classroom be covered or removed. Smith testified that the clock was there when they moved into the room but that they never used it to teach the children time or even referenced what time it was to the children. Nevertheless, Mrs. Siefker informed Smith's supervisor, Laura Springer, that she was not going to compromise and deny her God by allowing her children to attend that school unless the clock was covered or removed. Mrs. Siefker even had discussions with

the assistant superintendent about the clock, but ultimately the decision was made that the clock would not be removed.

{¶66} When the children's attendance first started to become sporadic, the bus continued to drive to the home to pick up the children. However, Mrs. Siefker began calling the school in the morning to inform them that the children would not be attending. On one particular day, Mrs. Siefker called-in the children's absence from somewhere other than her home. Smith and Springer then called the home to ask Mr. Siefker what was happening. He stated that he did not know his wife had called. He then told them to send the bus because he wanted the children to go to school. The bus was sent and the children were taken to school that day. However, shortly after that day, the children did not return to school, and Mrs. Siefker attempted to withdraw them. Due to the temporary orders of the court, the school did not permit this, but the Siefkers did not return their children to school.

{¶67} Despite all these problems, Smith testified that the children learned well during the time she had with them and enjoyed being in school until shortly before they stopped attending. However, the restrictions placed upon her by the Siefkers made her job of teaching more difficult. For instance, although Z.S.1 could spell and read, trying to assess his reading level and comprehension was difficult because of the limited materials she was permitted by Mrs. Siefker to use. Nevertheless, Smith testified that the children did well and that the school made

many concessions for the Siefkers because the children were amazing, the staff realized that having that many children in one home was difficult, and everyone on staff wanted to do whatever was "needed to do for the kids' sake." As an example of their progress, Smith testified that Z.S.2 became much calmer, knew what was expected, and had fewer periods of upset. She also learned to sit and perform an "undesired task,"[3] write her first name, and work without being prompted. Z.S.3, who was non-verbal and was not toilet trained, was taught to use objects to tell others what he wanted and learned to use the toilet. For instance, he would grab an empty roll of toilet paper that Smith had provided to him and take it to a staff member in order to convey that he needed to use the restroom. He did this with other objects as well.

{¶68} Smith further testified that she was concerned for the children, special needs or without special needs, because of the amount of time that they spent in the household without being around different people. This concerned her because the children would not learn socially acceptable behavior and a lack of exposure would be detrimental to them in the future. She also doubted that any of the children could obtain the type of education that they needed in the home given the number of children, the special needs of three of them, the time needed, and the limited materials available to them.

---

[3] Smith described an "undesired task" as one that Z.S.2 did not want to do or initiate on her own, but rather, was a task she was instructed to do by Smith.

{¶69} Virginia Flores testified that she saw a change in the children at school and saw much more progress than any she witnessed in their home. For instance, Z.S.1 became more social and was no longer afraid to ask other people questions. Z.S.2, who was only home-schooled for fifteen to twenty minutes a day before being enrolled in school, was less frustrated learning at school than she had been at home, could eat with a spoon, participated in music class, and developed more social skills. Z.S.3 was toilet trained at school in about a month but the Siefkers did not continue that at home. In the Siefker home, Flores noticed that the high chairs were not used quite as often. However, she testified that over the years Mrs. Siefker's dress code had changed from pants being acceptable, to only dresses being acceptable, to most recently that a female needed to have her neck covered as well.

{¶70} She also stated that Mrs. Siefker came to her in early April of 2009, to inform her that she was withdrawing the children from school. Flores attempted to discourage her from doing so and gave her an example of how they were trying to follow Mrs. Siefker's rules, such as only teaching them in terms of real things. The example was about whales, how big they are, their weight, etc., but Mrs. Siefker told her that if they were not acknowledging that God made them and thanking God for making them, this was unacceptable, and she was no longer

going to sacrifice her faith. At this time, Mrs. Siefker also informed her that she was twenty-two weeks pregnant.

{¶71} Flores was concerned for the children because Mrs. Siefker told her that she was at peace with DJFS removing the children from her custody because God would protect them. She also testified that Mrs. Siefker's religious-based rules had changed several times throughout the years. Also, she found that Mr. Siefker made more attempts to abide by the court's temporary orders than Mrs. Siefker did, that the Siefkers disagreed about sending the children to school, that Z.S.1 enjoyed school but wanted to please his mother, who told him that school was not good, and that Mrs. Siefker repeatedly found something wrong with what the school was doing, including ordering that magazines in the staff lounge be removed, even though the children did not enter the lounge. In short, Flores testified that Mrs. Siefker was looking for problems and that it was very difficult to teach the children because Mrs. Siefker constantly changed her mind. However, she noted that the children learned more in their short time in school than what they could have accomplished at home in the same amount of time.

{¶72} Laura Springer, the Director of Student Services in Special Education for Defiance City Schools, testified that she has worked with the Siefkers for approximately two years, including when the children were being taught at home and at school, and has spoken to the Siefkers many times. She

testified that the three oldest children needed to be taught in school because the Siefker home was always chaotic and too small for effectively teaching the children at home. She further testified that the children needed socialization but that Mrs. Siefker's views were becoming more rigid and rule-based, preventing this from happening. In addition, she stated that socialization with strictly those who live or visit the home was not sufficient, and she feared what would happen to the children if something happened to their parents because they would not be prepared to live in the world.

{¶73} She also testified that bi-polar disorder does not simply go away. However, she stated that she would not be surprised if a doctor evaluating Mrs. Siefker stated that she did not have bi-polar disorder because Mrs. Siefker "is extremely articulate, intelligent, and she can present * * * whoever she wants to be." Springer then questioned whether any such evaluator had seen Mrs. Siefker over a period of years rather than simply on one occasion. She further testified that based on her training and experience she has learned to recognize the signs of mental illness, and "how the religiosity and scrupulosity is one of the favorite things to latch on to when you want to have rules and order to follow, and then you can defend anything, because everybody buckles if it's in the name of religion * * * so people tend to not get the help that they need." Thus, she believed that Mrs. Siefker has a religion but that it is mixed in with mental illness. She also

testified that she knew Mr. Siefker disagreed with many of his wife's views but eventually decided to support her.

**{¶74}** Mrs. Siefker also testified.  When asked about the children not being in her care some day, such as when they are adults, she stated that she and her husband do not think of their children leaving them, that she expects her special needs children to be with her until she dies, and that while she teaches them life skills, she does not teach them independence because family supersedes that and she hopes that someone would take them in rather than sending them to a group home.  She further stated that she "just [doesn't] think that far ahead.  I just teach them daily and love them daily."

**{¶75}** Mrs. Siefker also stated that she would not teach any curriculum the school provided, even if she were able to adapt it to include her religious beliefs, such as teaching that whales have spouts *because God gave them spouts* (which is what she believes is the true and correct way to teach).  She specifically testified that the children learn all day long because their entire day revolves around the teaching of time (according to her clock – "what God has revealed unto [her]"), the calendar, the colors that she asserts go with them (only the colors of the rainbow), and the scriptures.  Lastly, she admitted that she does not allow the children out of the home or their backyard because she does not want them to see anything that she believes is unholy, and no other children interact with hers.

{¶76} Mr. Siefker testified at this hearing as well. He denied being an absent father and stated that he believed his children were being properly educated and developing properly. He also admitted to disagreeing with his wife at times regarding what was best for the children but that now "we have unified and we are a family[,]" they are on the "same page," and they are "making decisions as a family."

{¶77} The trial court was also provided with the psychological evaluation performed on the Siefkers and their children (as was practicable given their ages and intelligence levels). Dr. Wayne Graves performed all of the evaluations. He noted Mrs. Siefker's history of psychological counseling and treatment, including having a nervous breakdown at age nineteen. He found that Mrs. Siefker had an "obsessive thought style," that the contents of her thoughts were "intensely and obsessively biblical or faith based," and that her ideas had a "grandiosity to them that might be delusional." He found her ideas to be understandable but idiosyncratic and that she avoids much self scrutiny. Further, he stated that "[g]iven [her] defensiveness, her profiles do not support any kind of diagnosable psychopathology [but] [s]ome may be present if she were more open and disclosing." She also has "strong rigidity of thought and the intensity seen in obsessive thinkers." He also found that "[t]here is a part of her that believes that she is better than others and has an air of conviction that her ideas and point of

-44-

view are positive and correct. This amounts to some grandiosity of belief." Dr. Graves also stated:

> **There is also clear indication of poor ability to self limit with her obsessive ideas and beliefs. The behavioral rituals that she uses are partly based on anxiety reduction. All this is mixed with her strong and isolated faith system that has become obsession like and is not very open to change, in part because she must stick to them or feel panicky and out of control; and in part because they are supposedly from God (her biblical interpretation).**

{¶78} In sum, Dr. Graves found that Mrs. Siefker has very little insight, is closed to views other than her own, possibly limits the expression of more aberrant ideas because she knows that they would be received with alarm or concern, has ideas that are driven by an obsessive process, and has an orientation with some elements of narcissism. Further, "[s]he has a focus that is more on self and her own world than clearly on the children and their world * * *[and] lacks the ability to have a good overview of her children in the future and how their best interest might be served in the future." He found that her OCD is still present "but more folded into her faith and religious beliefs[.]" Her beliefs and ideas about physical health and illness as it relates to evil "sound close to delusional in their intensity and effects * * * They seem to develop more elaboration over time and are lived out with more intensity. In that way they are likely to produce more functional difficulty for [Mrs. Siefker's] parenting tasks and her responsiveness to authority." Dr. Graves also suggested that Mrs. Siefker's pregnancy would produce more

pressures that would significantly affect her stability and that the home environment was likely to deteriorate further.

**{¶79}** In regards to Mr. Siefker, Dr. Graves found that he was "much more open and disclosing" than his wife, "is more prone toward being dependent in his relationships than independent and would likely lean on someone else for emotional support." He also found that Mr. Siefker did not have "a lot of self awareness or insight;" does not have "the same beliefs about fiction and reality[,] [b]ut he lets [his wife] 'set the pace[;]'" and "does defer to [his wife] [b]ut he supports and has the same beliefs as her." Mr. Siefker acknowledged that he and his wife "'are not good planning people. We react more to the moment.'" Dr. Graves determined that Mr. Siefker is supportive of his wife, not very independent of her, and would not "have the emotional strength or assertiveness to effectively oppose [his wife] if he does not agree with her, as long as she frames her direction as biblical."

**{¶80}** Dr. Graves found that the family dynamic was high stress, with "so much ritual and forced pattern as to inappropriately confine the children to chairs or the table for too long (two plus hours)." Because of the time and energy needed to handle the three special needs children, the younger three were deprived of "much focus, attention, verbal interaction or freedom except in an indirect style." Dr. Graves also found that the three older children and one of the twins, who had a

traumatic brain injury at age two according to Mrs. Siefker, needed the resources of the public school system to receive an appropriate education and the best services for their special needs and that early intervention was necessary to long term functioning. He also determined that the decisions to limit the children's exposure to fantasy and the like would ultimately fail and that fantasy play is an important tool in learning planning and goal setting. Dr. Graves further opined that the special needs children "will not achieve much of their potential for growth in this home. This environment is likely to stifle their learning." As for the younger, non-special needs children, Dr. Graves found that "they will have some clear and significant reduction in the richness of their learning environment and amount of attention that they receive * * * [which] would be improved by the older three being in school."

{¶81} Dr. Graves opined that Mrs. Siefker did not present a physical threat to her children but represented "a risk to the emotional and psychological health of their children, especially if allowed to isolate the children from peers and community support[.]" He recommended that the Siefkers use public educational resources with respect for the family's beliefs but that Mrs. Siefker not be permitted to have control over the programming or setting to the extent she was previously allowed. He also recommended limiting the overuse of confinement beyond 30-40 minutes and more free play when able. He also recommended

psychotherapeutic intervention and support for the Siefkers and that the court require Mrs. Siefker to be re-evaluated for medication management and to have her psychiatrist apprised of the contents of his evaluation. Dr. Graves cautioned removing the three older children from the home but recommended that they be placed outside of the home if the Siefkers were unwilling to accept the recommendations. As for the younger three children, he recommended monitoring their continued placement, depending on the reaction of the parents to the removal of the three oldest.

{¶82} In rendering its decision on the record, the trial court explained to the Siefkers that its decision to place the children in protective supervision with express conditions was not meant to impinge upon their faith. Rather, the court found that this is a developmental situation wherein the children had an individual right "to develop to their maximum potential whatever that potential may be" and the younger children, although not of school age, "have the right to a useful education as it relates to the world in which they will have to live." The court stated that it believed that its orders "will accomplish the rights for the children with very little interference to the parents' very personal, always changing religious revelations." The Siefkers then informed the court that they would not comply with the court orders.

{¶83} Although the Siefkers correctly assert in their appeal that Mr. Siefker did not specifically state that he would not follow these orders, the words he chose to respond to the court's inquiry ("*We* had stated that *we* would unify in *our* defense") after hearing his wife's response merely seconds before being asked himself clearly indicated that his answer was the same as his wife's. In fact, Mr. Siefker's response occurred even after the court declared that it was vacating its protective supervision order and granting temporary custody of all six children to DJFS because Mrs. Siefker stated that she would not follow the court's orders. At no point did Mr. Siefker or counsel on his behalf express anything contrary to Mrs. Siefker's position, including when the court informed the Siefkers that it would consider protective supervision if they had a "change of heart."

{¶84} We find that the court did not err in ordering temporary custody of Z.S.1, Z.S.2, and Z.S.3 to DJFS as such decision was supported by significant competent and credible evidence. The court was faced with a situation where Mrs. Siefker's beliefs were ever changing, her rules were ever increasing, and her views were becoming grandiose and unyielding. The school did everything within reason, and then some, to accommodate Mrs. Siefker's demands and, yet, this was still not sufficient for her, resulting in her removing the children from school. She then reverted to her isolationist ways and refused to acknowledge or even think about her children's futures and how they would be able to live in the world

outside of her home and backyard. Nevertheless, the court attempted to avoid the removal of the children from their home by initially granting protective supervision with minimal conditions, including permitting the younger children to be home-schooled. Only when the Siefkers proclaimed in open court that they would not adhere to any of these conditions did the court take the next step of removing all the children from the home.

{¶85} While much of the evidence involved the education of the school-aged children, the other three were closely approaching school age and the Siefkers asserted that they would also not provide these children with an education based upon an approved curriculum. Further, the court had every reason to believe that the Siefkers would continue isolating these children and not permit them to be exposed to the outside world. Thus, as previously noted, the court did not have to experiment with their welfare to see if they would suffer great detriment or harm before placing them in the custody of DJFS as well. Therefore, the trial court did not err in this regard either.

{¶86} Although the Siefkers assert that the trial court based its decisions upon a disagreement with their religious beliefs, we do not find that to be supported by the record. First, the use of the high chairs was never explained to be based upon some sort of religious belief. Rather, it was Mrs. Siefker's way of maintaining her routine and keeping order throughout the day. While Mrs. Siefker

could explain the use of the zip ties and bolting the chairs to the wooden frame for safety purposes, she could not explain why she could not find some alternative to such prolonged restraint or why they were necessary for all the children. Second, the court expressly stated that this country jealously guards the right to individual religious freedom of thought and parents have the right to direct the education and rearing of their children, but it correctly noted that this right was not absolute. See *Wisconsin v. Yoder* (1972), 406 U.S. 205, 92 S.Ct. 1526. Further, the court noted that the neglect was due to Mrs. Siefker's mental condition, which it found "tenuous at best."

{¶87} This is not simply a disagreement about religious beliefs. The court found that these children were being retarded in their development to the point of serious harm because they were not being given the basic education they need and were being isolated from the world by being, essentially, locked away.

{¶88} Although we do not find that the trial court's decision was based upon the infringement of religion but rather was based upon the mental health issues of Mrs. Siefker and her husband's unwillingness to protect his children, many of Mrs. Siefker's justifications for her actions regarding her children were based upon her claim of individually held religious beliefs. Therefore, we elect to address the Siefkers' contention that their religious rights are being infringed upon.

{¶89} Throughout these proceedings, the Siefkers have likened their case to that of the United States Supreme Court decision in *Wisconsin v. Yoder*. Specifically, they assert that while the government has a compelling interest in educating its citizenry, the court in this case has not utilized the least restrictive means to advance this interest.

{¶90} In *Yoder*, the United States Supreme Court held that Wisconsin's compulsory school attendance laws, requiring children to attend formal high school to age sixteen, violated the Amish faith's right to free exercise of religion. *Id*. In so doing, the Court noted the state's power "to impose reasonable regulations for the control and duration of basic education" due to its "high responsibility for education of its citizens[.]" *Id*. at 213. However, the Court held that "it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Id*. at 214.

{¶91} Nevertheless, the Court found that "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Id*. at 215-216. Further, the Court noted that "activities of individuals, even when religiously

based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare[.]" *Id*. at 219.

{¶92} The Court went on to find that the Amish had sufficiently demonstrated that their deep religious convictions pervaded and determined virtually their entire way of life and was "not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." *Id*. at 216. Thus, the Court held that sending Amish children to high school rather than providing a vocational education to them in order to prepare them to live in the Amish community "contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child." *Id*. In fact, the Court found that the undisputed testimony of the experts presented by the Yoders established "almost 300 years of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life" that supported the claim that compulsory school attendance to age sixteen "would gravely endanger if not destroy the free exercise of [the Yoders'] religious beliefs." *Id*. at 219. Thus, the Court held that the Amish children could not be compelled to attend school beyond the eighth grade because the government's interest at that point was significantly diminished and there was a less restrictive alternative, i.e. the vocational education provided by the Amish. *Id*. at 236.

{¶93} The facts of this case are not similar to those in *Yoder*. The Siefkers are not part of a community that has managed to remain in existence and steadfast in its beliefs for over 300 years or even 3 years. The Amish did not attempt to isolate their children from everything outside of their home. The Amish educate their children to live in the Amish community. They do not change their beliefs every day and, as the trial court noted, they recognize that their children can adjust to different sets of rules in different places and they allow it to happen.

{¶94} In contrast, the Siefkers have refused to think beyond their children's needs today and are doing very little to prepare them for a life outside of their parents' home, choosing to assume that the children will live with them until they die and making no provisions for these children once their parents are deceased. Further, they have denied the children their own right to a basic education in many respects as well as the right to develop to their full potential due to the Siefkers' refusal to permit any form of education that is not entirely "from the Bible" or "Biblically approved," which only Mrs. Siefker has the ability to determine.

{¶95} Ohio has long followed the rationale of *Yoder* and other United States Supreme Court precedent regarding balancing the government's interest and the individual's right to freely exercise his religion. See e.g., *State v. Whisner* (1976), 47 Ohio St.2d 181, 351 N.E.2d 750. In order to determine whether the government has impermissibly infringed upon a person's free exercise of religion,

a three-part test is applied: (1) are the religious beliefs truly held, (2) has the government infringed upon the person's constitutional right to the free exercise of religion, and (3) if the first and second questions are answered affirmatively, has the state demonstrated a compelling interest for its infringement which is done in the least restrictive means. *State v. Schmidt* (1987), 29 Ohio St.3d 32, 34, 505 N.E.2d 627; *Whisner*, supra; see, also, *State v. Bontrager* (3rd Dist. 1996), 114 Ohio App.3d 367, 683 N.E.2d 126.

{¶96} For example, in regards to the first prong, the test is "whether 'a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God.' * * * [This] satisfaction requires more than a personal or philosophical belief." *Bontrager*, 114 Ohio App.3d at 371, 683 N.E.2d 126, quoting *United State v. Seeger* (1965), 380 U.S. 163, 166, 85 S.Ct. 850.

{¶97} The evidence in the case sub judice was abundantly clear that Mrs. Siefker's beliefs, known only to her, were constantly changing and often carried the appearance of being pre-textual in order to keep the children confined to her home and under her exclusive control. While she steadfastly professed to believe in the existence of God and Jesus Christ and that the original King James version of the Bible was true, the "tenets" or "rules" of her faith were always in flux, rarely remaining the same from day-to-day. For instance, one day something was

not sinful, the next day it was. Thus, it is difficult to determine what is truly held because it could change the next day, the next week, or the next month. Moreover, more than one person, including Laura Springer, Dr. Graves, and Mrs. Siefker's own mother, opined that these beliefs were intertwined with Mrs. Siefker's mental condition, particularly her OCD and anxiety issues. This renders it nearly impossible to discern whether a particular position she has is based on her religious beliefs, her mental condition(s), or a combination of the two. Further, Mr. Siefker seems to follow whatever belief his wife has, rather than forming his own belief system. Thus, determining whether he truly holds these beliefs is also difficult, if not impossible.

{¶98} In sum, we find that the trial court properly determined in this case that the State has a compelling interest to educate its citizenry and prepare them for the world beyond the one crafted by their parents, who are statistically more likely to die before their children, and that the State also has a compelling interest in not allowing children to be imprisoned or caged in their home due to the irrational faults, habits, or fears of their parents.

{¶99} We further conclude that the trial court in this case consistently made every effort to respect the Siefkers' claims of free exercise of their religion and to balance the interests of the children and the interests of the State with those claims only in the least restrictive means. However, the Siefkers persistently

refused to allow any balancing. In fact, in the end, Mrs. Siefker expressly stated that she would not use any curriculum provided by the State even if she was permitted to adapt it to conform to her religious beliefs, and only when the Siefkers chose to disavow the court's orders did the court then act to remove the children. Yet, even then, the court informed them that it would reconsider protective supervision if they changed their minds. Accordingly, even assuming *arguendo* the legitimacy of the Siefkers' religious claims, the trial court did not violate the Siefkers' right to free exercise either by finding them dependent and neglected or by granting temporary custody of the children to DJFS.

{¶100} For all of these reasons, both assignments of error are overruled, and the judgments of the Common Pleas Court, Juvenile Division, of Defiance County are affirmed.

*Judgments Affirmed*

**PRESTON, J., concurs.**

**/jlr**

**WILLAMOWSKI, P.J., concurs in judgment only.**

{¶101} I concur with the decision of the majority, but not necessarily with the rationale. Therefore, I concur in judgment only.

{¶102} After determining that all six children were neglected and dependent, the trial court, on June 30, 2009, initially placed the children back in their home with protective supervision granted to DJFS. Upon the parents indicating that they would not follow the seven conditions the trial court placed upon them in returning the children to the family home, the trial court changed course and granted temporary custody of all six of the children to DJFS, but not until August 1, 2009.

{¶103} I agree with the adjudication of dependency as to each of the six children. I also agree with the disposition of temporary custody to DJFS as it relates to the three oldest children, but note that it may have been premature as to the three youngest children. Of the seven conditions, the first, second, sixth and seventh pertained to the schooling for the three oldest children, all of mandatory school age, all of whom had special needs. These four conditions needed to be met within one month from their placement into temporary custody. The fifth condition pertained to not changing doctors without notice and could readily have been met by an order of protective supervision. The third and fourth conditions pertained to the three youngest children, the five year old twins and the four year old. These conditions related to their schooling, once they would, in the future, at age 6, go to school; something which wasn't going to happen for at least one to two years from the date of the dispositional hearing.

{¶104}    However, the appellants' assignments of error only raised issues concerning the juvenile court's findings of dependency on appeal.  They did not appeal the trial court's findings of neglect, nor the disposition granting temporary custody of the children to DJFS.  Therefore, I must concur with the decision of the majority as to the findings of dependency of all six children and the resulting granting of temporary custody of the children to DJFS.