[Cite as *In re G.Z.*, 2025-Ohio-2661.]

COURT OF APPEALS
HOLMES COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| G.Z. | : | Hon. Robert G. Montgomery, J. |
| | : | Hon. Kevin W. Popham, J. |
| | : | |
| | : | |
| | : | Case No. 25CA005 |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Holmes County
Court of Common Pleas, Juvenile
Division, Case No. 24 N 111

JUDGMENT:    Reversed and Remanded

DATE OF JUDGMENT:    July 29, 2025

APPEARANCES:

For Plaintiff-Appellee    For Defendant-Appellant

ROBERT K. HENDRIX    JACQUELYN M. DOSSI
Assistant Prosecuting Attorney    Johnson, Helmuth, Miller & Dossi
Holmes County, Ohio    P.O. Box 149
164 E. Jackson Street    343 S. Crownhill Road
Millersburg, Ohio 44654    Orrville, Ohio 44667

*Baldwin, P.J.*

{¶1} The appellant, P.Z., appeals the decision of the Holmes County Common Pleas Court, Juvenile Division, finding G.Z. was a dependent and neglected child. Holmes County Department of Job and Family Services ("the Agency") is the appellee.

## STATEMENT OF THE FACTS AND THE CASE

{¶2} G.Z. was born on September 17, 2017. The appellant is G.Z.'s biological father. G.Z. has been in the sole care of the appellant since his parents' separation.

{¶3} On August 29, 2024, the Agency filed a Complaint alleging G.Z. to be an Abused, Neglected, and Dependent child. On that date, the trial court held a shelter care hearing and continued the temporary custody to the Agency.

{¶4} On October 31, 2024, the appellant filed an amended Complaint with updated allegations of abuse.

{¶5} On January 14, 2025, the trial court held a hearing on the Agency's Complaint.

{¶6} At the hearing, Carrie Schnirring first testified that she is employed as a psychology assistant at the Lighthouse Family Center in Canton, Ohio. Ms. Schnirring had G.Z.'s current teacher, former teachers, and foster mother fill out a behavioral checklist.

{¶7} G.Z.'s kindergarten teacher noted more concerns on the checklist. She described G.Z. as defiant, aggressive, and that he breaks classroom rules. He was very disrespectful to adults and had extreme tantrums.

**{¶8}** His first-grade teacher noted on the checklist that G.Z. has problems with regulating his emotions and social interactions. He is a very smart boy; he says he "wants to be good all the time." G.Z. has problems processing his emotions calmly. His current teacher noted he is in the normal range for aggression and defiance. However, he acts younger than his peers when new academic material does not come easily to him. He will run to a corner to cry, has hit his computer, throws objects, and says he is afraid of not doing well academically.

**{¶9}** During Ms. Schnirring's interview with G.Z., she noted it was significant that G.Z. told her that the appellant did not want G.Z. to turn out like G.Z.'s grandfather. The appellant told G.Z. that his grandfather did not handle life or stress well and committed suicide. G.Z. would then justify this by saying, his dad just wanted him to be smart and strong. The appellant has G.Z. do extra academic work, typically math at the Fourth and Fifth grade level. If G.Z. gets a problem incorrect, the appellant has G.Z. start the problem from the beginning. Ms. Schnirring found this significant because during a visitation, G.Z. was counting money in a Monopoly game and got it wrong. His dad had him redo it. G.Z. started crying.

**{¶10}** Ms. Schnirring had G.Z. draw a picture of his family. G.Z. drew a picture of himself with his grandmother, because his grandmother loves him and does not punish him. He did not initially include his father in the picture. G.Z. said his dad is the one who punishes him with a spanking on the behind or legs. G.Z. also said he has been spanked with a rubber belt. G.Z. said the spankings do not leave a mark, but they do cause pain. Ms. Schnirring mentioned that G.Z. slouched in his seat and spoke quietly when discussing the visitation, where he became upset while counting the Monopoly money.

**{¶11}** While identifying emotions and what makes him feel different emotions, he identified "extra math" as a source of his sadness. G.Z. told Ms. Schnirring that he is supposed to do extra math, and when he cries, the teacher takes it away from him. Sometimes he cries because the math is too hard, and he says he cannot ask the teacher for help. Ms. Schnirring thinks G.Z. does not believe it is safe to go to adults for help when needed. Ms. Schnirring believes the appellant has placed expectations on G.Z. that are not age-appropriate. She bases this on notes from the visitation monitor.

**{¶12}** Ms. Schnirring also met with the appellant after her report was submitted. The appellant expressed a lack of interest in working the case plan until a judge became involved. He told Ms. Schnirring he believed G.Z.'s mental health was good before the Agency became involved. He told Ms. Schnirring that there were behavioral challenges. He said he worked through them with patience to resolve the issues. Ms. Schnirring became concerned when the appellant explained he needed to prepare his son for a civil war. He felt that if President Trump had been assassinated, a civil war would have broken out.

**{¶13}** When Ms. Schnirring spoke with the appellant about G.Z. getting upset, feeling like he cannot get things wrong, and getting upset, the appellant said, "That's life." Ms. Schnirring testified that she believes the appellant should protect G.Z. from stressors and scary information. The appellant's parenting strategy is to toughen G.Z. up.

**{¶14}** Ms. Schnirring testified that she believes the appellant is excessively punishing G.Z. She believes that the appellant is "gaslighting" G.Z. by saying he is not angry when punishing G.Z., but is doing this to make G.Z. smarter.

{¶15} Ms. Schnirring described G.Z. as hypervigilant, seeking a highly structured environment, and arguing with his foster-mother over inconsequential details. He also exhibits temper tantrums. This led Ms. Schnirring to diagnose G.Z. with post-traumatic stress disorder. Ms. Schnirring thinks that his meltdowns when making mistakes stem from his difficulties with his father. She also believes the Agency's involvement has caused G.Z. to experience trauma. Ms. Schnirring thinks that if the appellant does not admit his parenting techniques are causing G.Z. anxiety or are mentally abusive, then he is unlikely to change those techniques.

{¶16} On cross-examination, Ms. Schnirring testified she did not speak with either of G.Z.'s parents before performing her evaluation. She only spoke with G.Z.'s case worker, foster-parent, and two of his teachers. She has no information about G.Z.'s emotional behavioral history before kindergarten.

{¶17} Ms. Schnirring testified that G.Z. is a smiling and pleasant child. She believes that this is a coping mechanism that deteriorates when he makes a mistake. Ms. Schnirring noted that G.Z. started school a year early. He is gifted in reading and mathematics. She understands that a decision needs to be made for gifted children to ensure they are academically challenged, or to hold them back academically until they are socially mature enough.

{¶18} On cross-examination, when asked about G.Z.'s panic about asking for help, Ms. Schnirring testified that she never asked the teachers if G.Z. had been reprimanded for interrupting in class or if the teacher was available for instruction while he was doing his extra math. Ms. Schnirring testified that G.Z. has been having

nightmares since placed in foster care. She testified that since being in foster care, he has continued to have outbursts in school.

**{¶19}** Ms. Schnirring also testified that his rigid, scheduled behavior may be due to an obsessive-compulsive disorder-like condition. Still, she thinks it is more likely due to the appellant's parenting strategy. Ms. Schnirring summarized that she believes the appellant is excessively punishing G.Z. with spanking, spanking with a rubber belt, redoing advanced math problems, and requiring G.Z. to exercise when he does not regulate his emotions. Ms. Schnirring believes this punishment is mentally abusing G.Z., as he feels he cannot ask adults for help and cannot make mistakes.

**{¶20}** Next, Hannah Rehm testified that she is an intake worker for the Agency. Ms. Rehm testified that G.Z. is a grade ahead for his age. He has been identified as gifted academically. G.Z. has had emotional outbursts in class when he is frustrated with learning new material or does not perfect something. It would not surprise her to learn that G.Z. did this in first grade and kindergarten, and it would not surprise her to learn that this behavior is lessening.

**{¶21}** Ms. Rehm observed a portion of a visit between the appellant and G.Z. During the visit, G.Z. became anxious. He was frustrated when playing Monopoly and doing math problems. He pulled his hair and hit himself. Ms. Rehm said she has not been very involved past the first forty-five to sixty days of a case. However, it is her understanding that G.Z.'s emotional outbursts have lessened since the appellant lost visitation.

**{¶22}** Next, the appellant testified that he is the father of G.Z., and L.Z. is the biological mother of G.Z. The appellant and L.Z. separated in January of 2021. L.Z.

FaceTime's G.Z. a couple of times a month. The appellant has experienced long stretches of illness since 2020. He has been to the ER multiple times. The appellant has always facilitated G.Z.'s education. They watch YouTube videos, he reads to G.Z., and has G.Z. read to him. He gets educational books at Walmart, and they work on them every day. Since before G.Z. could walk, he wanted to learn and master skills.

{¶23} The appellant testified that both he and G.Z. follow schedules. They wake up, he gets ready for school and does some academic work in his book. The appellant said he wants to instill in G.Z. the importance of always taking care of his responsibilities first. After school, G.Z. does his homework, but usually finishes that quickly. He then works with the appellant on his math book or reads with him. He testified that he does not make G.Z. do work without any direction or instruction and punishes him for getting it wrong. The appellant says what happens when G.Z. gets something wrong depends on what it is that he gets wrong. If it is something that G.Z. has done before, the appellant has G.Z. try again.

{¶24} When the appellant played Monopoly with G.Z. during a visitation, G.Z. incorrectly added numbers that he had done many times before. The appellant had G.Z. try again. On this day, G.Z.'s emotions got out of control after he gave the same wrong answer multiple times. When G.Z. hit himself, the appellant told him to stop and not ever do that. This was the first time the appellant had ever seen G.Z. hit himself.

{¶25} When G.Z. was in kindergarten, the teacher would give the appellant daily updates on any behavior G.Z. exhibited that was unacceptable. The appellant would address it with the son. Eventually, he did not receive any further reports, and he assumed the issues had ceased. In first grade, he did not receive feedback initially, but then the

teacher told him that G.Z. had behavioral problems. They set up the same situation where he received daily reports and addressed them with G.Z. The appellant also noted that G.Z. has always been upset when he loses or does not understand academics.

**{¶26}** The appellant also addressed the allegations that if G.Z. is not perfect, the appellant makes him exercise until he cries. The appellant stated that if G.Z. is playing his video game and has an angry outburst, the appellant warns him twice. If he throws the video game or still does not calm down, the appellant has G.Z. go for a run. The run is less than 0.2 miles and takes G.Z. less than two minutes to run it. The appellant does the run with him. He has noticed that G.Z. has a difficult time reading others' emotions. He will play with a child on the playground and not realize when the child does not want to play.

**{¶27}** If G.Z. has other behavioral issues, the appellant may have G.Z. do extra pages in his academic book. The appellant believes a timeout or sitting in a corner is not productive. He wants him to do something productive to make up for his behavior. He sees it as more of a coping mechanism. When G.Z. is crying while doing the extra academic work, the appellant believes it is due to G.Z.'s initial emotional deregulation rather than from an inability to complete the work. The appellant also testified that he used spanking rarely and the belt in even rarer circumstances. The appellant never caused a physical injury, and G.Z. did not require medical attention.

**{¶28}** On cross-examination, the appellant testified that doing leg lifts was not just for punishment; they were also for exercise and to do something productive. He did not agree that he called his son stupid. He said making the same mistake multiple times is a sign of stupidity.

**{¶29}** The appellant testified that he was concerned with the report the Agency received because he was going through a divorce at the time. G.Z. has received all his vaccinations, regularly sees the dentist, and knows how to roller skate and ride a bike.

**{¶30}** The trial court found G.Z. not to be an abused child; however, the trial court did find by clear and convincing evidence that G.Z. is a neglected and dependent child.

**{¶31}** The appellant filed a timely notice of appeal and herein raised the following two assignments of error:

**{¶32}** "I. THE TRIAL COURT ERRED IN ADJUDICATING THE MINOR CHILD, G.Z., A NEGLECTED CHILD UNDER O.R.C. §2151.3(A)."

**{¶33}** "II. THE TRIAL COURT ERRED IN ADJUDICATING THE MINOR CHILD, G.Z., A DEPENDENT CHILD UNDER O.R.C. §2151.04(C)."

## STANDARD OF REVIEW

**{¶34}** Recently, in *In re L.L.*, 2023-Ohio-3032 (5th Dist.), we found the reviewing court conducts a manifest weight review:

> "The state bears the burden of proof of establishing that a child is abused, neglected, or dependent." *Matter of: L.H.*, 12th Dist. Warren No. CA2018-09-105, 2019-Ohio-2383, ¶20. "The Ohio Supreme Court has defined 'clear and convincing evidence' as '[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.' "*Matter of J.B.*, 5th Dist. Stark Nos. 2022CA00086, 2022CA00087, 2022CA00088, 2022-Ohio-3895, ¶22, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). A trial court's adjudication of a child as dependent must be

supported by clear and convincing evidence. R.C. 2151.35(A)(1); Juv.R. 29(E)(4). Proof by clear and convincing evidence requires that the evidence " 'produce in the mind of a trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is a higher degree of proof than preponderance of the evidence, but a lower degree than beyond a reasonable doubt. *In re Alexander C.*, 164 Ohio App.3d 540, 2005-Ohio-6134, 843 N.E.2d 211, ¶37 (6th Dist.).

When an appellate court reviews a trial court's adjudication to determine whether the judgment is supported by clear and convincing evidence, the reviewing court must determine whether the trial court had before it evidence sufficient to satisfy the requisite degree of proof. *Id*. at ¶7. That is, we conduct a manifest-weight review to determine whether the agency sustained its burden of producing clear and convincing evidence of dependency as defined by R.C. 2151.04. *In re C.T.*, 6th Dist. Sandusky No. S-18-005, 2018-Ohio-3823, ¶53. An appellate court will not reverse a trial court's adjudication where competent and credible evidence supports the findings of fact and conclusions of law. *In re Alexander C.*, supra at ¶7.

## I.

**{¶35}** In the appellant's first assignment of error, the appellant argues the trial court erred in finding G.Z. to be a neglected child pursuant to R.C. 2151.03(A). We agree.

## ANALYSIS

**{¶36}** R.C. 2151.03(A) states, in pertinent part:

(A)    As used in this chapter, "neglected child" includes any child:

* *

(2) Who lacks adequate parental care because of the faults or habits of the

child's parents, guardian, or custodian[.]

"Adequate parental care" is defined by statute as, "the provision by a child's parent or parents, guardian, or custodian of adequate food, clothing, and shelter to ensure the child's health and physical safety and the provision by a child's parent or parents of specialized services warranted by the child's physical or mental needs." R.C. 2151.011(B)(1).

**{¶37}** In the instant case, the Agency did not present evidence that the appellant failed to provide adequate food, clothing, or shelter to G.Z. Furthermore, no "specialized services" were identified that the appellant failed to provide that were warranted by G.Z.'s physical or mental needs. The evidence presented shows G.Z. was diagnosed as suffering from trauma and PTSD. Ms. Schnirring believes this is caused by the appellant's parenting and disciplining of G.Z. The appellee did not present any evidence that the appellant failed to provide adequate food, clothing, or shelter to G.Z. Nor did the appellee present evidence that the appellant failed to provide any specialized services, which were warranted by his physical or mental needs. Therefore, we find that the record lacks competent and credible evidence to support the trial court's findings of fact and conclusions of law.

**{¶38}** Accordingly, the appellant's first assignment of error is sustained.

## II.

**{¶39}** In the appellant's second assignment of error, the appellant argues the trial court erred in finding G.Z. to be a dependent child pursuant to R.C. 2151.04(C). We agree.

## ANALYSIS

**{¶40}** R.C. 2151.04 states, in pertinent part:

(A) As used in this chapter, "dependent child" means any child:

 * *

(B) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]

**{¶41}** "A finding pursuant to R.C. 2151.04(C) does not require parental or custodial fault." *In re L.L.*, 2023-Ohio-3032, ¶18 (5th Dist.). Rather, the inquiry "must be grounded on whether the children are receiving proper care and support; the focus is on the condition of the children." *In re A.B.C.*, 2011-Ohio-6570, ¶15, citing *In e Bibb*, 70 Ohio App.2d 117, 120 (1st Dist.1980). A parent's conduct "is relevant only insofar as it forms a part of the child's environment and it is significant only if it has a detrimental impact" on that child. *In re L.L.*, 2023-Ohio-3032, ¶18 (5th Dist.).

**{¶42}** "Generally speaking, courts apply R.C. 2151.04(C) broadly to protect the health, safety, and welfare of children." *Id*. at ¶19. "A finding of dependency under R.C. 2151.04 must be grounded on whether the children are receiving proper care and support; the focus is on the condition of the children." *In re A.B.C.*, 2011-Ohio-6570, ¶15 (5th Dist.). Although the focus of the trial court's analysis is on the child's present condition or environment, " 'the law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm.' " *In re A.B.C.*, 2011-Ohio-

6570, ¶27, quoting *In re Burchfield*, 51 Ohio App.3d 148, 156 (4th Dist. 1988). A court may consider a parent's conduct under R.C. 2151.04(C) "solely insofar as the parent's conduct forms a part of the environment of [the] child." *In re Burrell*, 58 Ohio St.2d 37, 39 (1979). "As a part of the child's environment such conduct is only significant if it can be demonstrated to have an adverse impact on the child sufficiently to warrant intervention." *Id.* "That impact cannot be simply inferred in general but must be specifically demonstrated in a clear and convincing manner." *Id.*

{¶43} After a thorough review of the record, we find that the trial court's adjudication of G.Z. as a dependent child under R.C. 2151.04(C) is against the manifest weight of the evidence.

{¶44} In the instant case, the evidence showed that G.Z. has experienced emotional outbursts at school since kindergarten; however, based on the teacher evaluations initiated by Ms. Schnirring, his behavior is improving. The appellant maintains a rigid schedule for G.Z., has high academic expectations for G.Z., and employs exercise, spanking, academic work, and spanking with a rubber belt as punishments when he perceives G.Z. as behaving inappropriately. When G.Z. fails at a math problem, the appellant has G.Z. repeat the problem. The Agency alleged that the appellant offers no guidance to G.Z. on the completion of academic work. The appellant refuted that claim, saying that he would let G.Z. work to find the answer by himself if he had already proven proficient on similar problems. The appellant also testified that if G.Z. is misbehaving and does not stop with multiple warnings, the appellant spanks G.Z. and has, on less than five occasions, spanked G.Z. with a rubber belt. The appellant has never caused an injury to G.Z. by either type of physical discipline. The Agency did not distinguish G.Z.'s behavior

from that of similarly aged children. They failed to present evidence that G.Z.'s behaviors, the frequency of those behaviors, or the severity of those behaviors are different from those of most seven-year-old children.

**{¶45}** The appellant testified that he attempts to make G.Z. do something productive as a consequence of misbehaving. Such consequences include completing extra academic work and exercising.

**{¶46}** The Agency's expert witness spoke with G.Z. only on a few occasions. This was after G.Z. had been removed from the appellant's care. The expert issued a report prior to even speaking with the appellant. G.Z. is also dealing with the separation and divorce of his parents, his mother's diagnosis and treatment for breast cancer, and he is a gifted student who is a grade above his age. The expert testified that any of these could cause PTSD in G.Z., but she believes it is more than likely caused by the appellant's parenting.

**{¶47}** The evidence suggests that G.Z. has an aversion to asking adults for help, experiences emotional outbursts in school and at home, and becomes upset when losing a contest or not mastering academic material as quickly as he would like. The Agency did not present evidence on how this differs from other seven-year-old children. Furthermore, beyond the conclusory testimony of the Agency's expert that appellant's parenting was "more likely" the cause of G.Z.'s PTSD than other trauma's in G.Z.'s life, the Agency did not show, by clear and convincing evidence, how the appellant's parenting adversely impacted the child's condition to the point that warrants the State to assume guardianship of G.Z.

**{¶48}** This Court does not condone a parent striking a child, and certainly does not condone the striking of a child with a belt. However, the trial court did not find G.Z. to be an abused child, but a dependent child. Since the evidence shows that the expert believes it is only more than likely the appellant's parenting is the cause of G.Z.'s PTSD, but failed to distinguish his behavior from others in his age group, the Agency did not "specifically demonstrate in a clear and convincing manner" that the appellant's parenting adversely impacted the child's condition to warrant the State acquiring guardianship of G.Z. *In re Burrell*, 58 Ohio St.2d 37, 39 (1979); R.C. 2151.04(C). Therefore, given the statutory scheme governing the adjudication of dependency and a parent's constitutional right to raise his child, we find the trial court's adjudication of G.Z. as a dependent child to be against the manifest weight of the evidence.

## CONCLUSION

**{¶49}** For the foregoing reasons, the judgment of the Court of Common Pleas of Holmes County, Ohio, Juvenile Division, is reversed, and this matter is remanded for further proceedings consistent with the law and this opinion.

By: Baldwin, P.J.

Montgomery, J. and

Popham, J. concur.